Dennis Wayne EMERY,
Respondent/Cross–
Appellant,

v.

WAL–MART STORES, INC.,
Appellant/Cross–
Respondent.

No. 80691.

Supreme Court of Missouri,
En Banc.

Sept. 22, 1998.

Rehearing Denied Oct. 20, 1998.

Jeffrey S. Thomsen, St. Louis, for Appellant/Cross–Respondent.

Thomas A. Connelly, St. Louis, for Respondent/Cross–Appellant.

PER CURIAM.[1]

Appellant, Wal–Mart Stores, Inc., appeals the judgment entered in favor of respondent, Dennis Wayne Emery ("plaintiff"), in his negligence action for injuries he sustained when he slipped and fell in a Wal–Mart store. Plaintiff cross-appeals the judgment of the trial court denying his motion for prejudgment interest. The judgment is affirmed.

At the time of the accident, plaintiff was thirty-six years old and lived with his family in Grandin, Missouri. Plaintiff worked as a mechanic for a charcoal plant and also ran his own truck-driving business as a second source of income. On September 19, 1988, plaintiff went to the Wal–Mart store in Poplar Bluff, Missouri, to have a key made. The store was what is often referred to as "self-service," where customers walk up and down the aisles with carts and handle the products themselves. The aisles are three feet wide and are intersected in a grid pattern by wider aisles called action alleys.

After he had finished with his task at the back of the store, he started to walk toward the front of the store. At the time, the store was preparing to close at 9:00 p.m. He went up an action alley and turned into one of the two aisles where pet food products were displayed. As he walked up the aisle, he glanced at the floor and then noticed a store employee directly ahead of him in another department aisle. This employee, Sandra Wawak, was restocking shelves. After taking approximately four steps, plaintiff put his right foot down on dog food causing both feet to come out from under him. As plaintiff fell, he grabbed a shelf in an attempt to catch himself and knocked several cans of cat food on the floor. Plaintiff's effort failed, and he landed on his back on the floor. The middle of plaintiff's lower back came down on some cans of cat food. When he looked at the floor after his fall, he saw several handfuls of dry dog food scattered over a three-foot area in the aisle where he fell.[2]

At trial, Tamara Lowe, the store employee in charge of the pet food department that evening, testified pet food spills were common occurrences, due to customers handling the product. The store did not place any mats on the floor in this area, although it did place mats in the live pet aisle where water

---

1. The appeal in this case was originally decided by the Court of Appeals, Eastern District, in an opinion written by the Honorable Gary M. Gaertner. Following transfer to this Court, the court of appeals opinion, as modified, is adopted as the opinion of this Court.

2. The floor of the aisle was linoleum, white in color with gray flecks. Plaintiff testified the dog food was cream colored, round in shape and approximately three-quarters of an inch to an inch in diameter.

and pet food spilled making the floor slippery. Instead, the store kept a broom and dustpan in the pet food aisle to hasten clean up of spills. The broom and dustpan were stored behind the stacked bags of dog food, requiring employees to crawl over the bags in order to reach the items.

According to Lowe's testimony, she found a dry pet food spill in the pet food department at 8:20 p.m. on the evening plaintiff fell. Lowe cleaned the spill using the broom and dustpan kept in the aisle. Contrary to store policy, however, Lowe did not look for nor locate the source of the spill. When Lowe left the aisle at 8:40 p.m., no other customers had been in the pet food department. At trial, Lowe testified the spill was in a different aisle from the one in which plaintiff fell and testified the dog food she cleaned up was of a different type than that on which plaintiff slipped. However, Wawak testified she saw Lowe clean up the spill at 8:20 p.m. in the same aisle as plaintiff's fall.

Steven Bost, the assistant manager of the store on duty that night, also testified at trial. He walked through the aisle on his way to see who was in the sporting goods section of the store approximately five minutes before plaintiff fell. Plaintiff was the only person in the area. Bost testified he saw no dog food on the floor of the aisle at that time. He also stated he did not notice Wawak, who was in the aisle arranging merchandise at the time.

Bost further testified about the procedures Wal–Mart had in place to ensure customers' safety. Employees were instructed to watch for spills. If the employee happened upon one, he or she was to stay with the spill until it was cleaned up. In such cases, the employee was to determine the source of the spill, recognizing that if a spill happens once, it can happen again. In addition, stock boys conducted safety sweeps of the store every three hours, during which time the employees looked specifically for spills. Bost testified Wal–Mart had daily meetings about safety considerations.

Immediately after plaintiff fell, he felt pain in his low back and felt "a tingling and a burning numb sensation" down the back of his leg. Wawak was working further down

an aisle when she heard cans falling and saw plaintiff lying on the floor. She approached him and asked if he was hurt. Plaintiff responded he was "more embarrassed than anything." The employee told plaintiff to remain sitting while she summoned the manager. The woman returned shortly with Bost. Bost asked plaintiff if he was all right and helped him up off the floor. Plaintiff then sat on a low stack of bags containing dog food for several minutes. Sometime during these events, the cans of cat food and the spilled dog food were cleaned up. After he was notified of plaintiff's fall, Bost searched for a trail of dog food leading to the checkout area, but found no other dog food spills. At trial, Bost, Lowe and Wawak testified they saw only three pieces of dog food on the floor after plaintiff's fall. Plaintiff testified there were several handfuls scattered across the floor.

After resting for a few more minutes, plaintiff left the store, escorted by one of the employees. Plaintiff then drove home, a distance of forty miles, where he honked the horn for his wife to come out to the car. His wife drove him to the emergency room at Lucy Lee Hospital. The medical staff there found plaintiff had numbness in his right hip and muscle spasm in the right lower back. The diagnosis was muscle spasm, for which he was prescribed various painkillers, as well as a contused kidney. Plaintiff missed several weeks of work immediately after the injury, but then continued to work both of his jobs, although he was never free from pain.

Plaintiff continued seeking treatment for his back problems from various doctors over the next six years. This treatment included an MRI scan of the lumbar spine performed at St. Bernard Regional Medical Center in Jonesboro, Arkansas, on February 22, 1989; a CT of the lumbar spine ordered by Dr. E.C. Hansbrough at the Kneibert Clinic in Poplar Bluff on February 24, 1989; an unsuccessful manipulation of the cervical lumbar spine on November 12, 1990; as well as a variety of physical therapy sessions. Finally, still suffering from back pain, plaintiff went to see Dr. Joseph Hanaway, a neurologist. Dr. Hanaway conducted an initial exam of plaintiff's low back on October 7, 1994, and

found plaintiff had a flattened lower lumbar region, spasm of the lumbar paraspinal muscles on the right, pain on the right from upper to lower lumbar region, and pain upon straight leg raise. Dr. Hanaway considered these findings to indicate plaintiff had a central herniated disc.

After obtaining and reviewing plaintiff's medical records since the accident, and after conducting a second examination of plaintiff, Dr. Hanaway ordered plaintiff to undergo several repeat tests. Plaintiff had an MRI of his lumbar spine taken on November 28, 1994. The test revealed a disc protrusion, also called a "bulging disc," with spur formation at L3–4. Dr. Hanaway stated the spur formation indicated the disc protrusion had existed for some time.

Plaintiff returned to Dr. Hanaway on May 12, 1995, still complaining of persistent back pain and neck pain. Dr. Hanaway's examination revealed muscle spasm all the way down the lumbar region, which begins approximately six inches above the belt line, as well as other symptoms indicating spinal cord compression. Dr. Hanaway ordered plaintiff undergo further MRI testing to other areas of his back and neck region. This took place on June 2, 1995. These tests revealed a disc herniation at T11–12, which, Dr. Hanaway explained, accounted for the muscle spasm in plaintiff's whole lumbar spine. In addition, the tests revealed multiple bulging discs in the neck. He prescribed painkillers and advised plaintiff to restrict activity and work very carefully. Dr. Hanaway further stated a herniated disc is an operable problem that may rid plaintiff of some of his pain, although the likelihood of success was not high. He believed there was a greater than fifty-percent chance plaintiff could need surgery in the future. Lastly, Dr. Hanaway stated these conditions were caused by plaintiff's fall in Wal–Mart.

Wal–Mart had plaintiff examined by its expert, Dr. Guy H. Frumson. He did not disagree plaintiff suffered from a herniated disc as well as several bulging discs. He rated the likelihood that plaintiff's fall caused the herniated disc as "in between possible and probable." He further opined plaintiff's

condition was likely to worsen and that "probably a surgery would be helpful, . . . ."

Plaintiff testified he never had trouble with his back or neck prior to his fall in Wal–Mart. His condition has gotten worse over the period of time since the accident. He testified he had to quit his trucking business from which he earned an average net income of $4,909 for the years 1985–1988. He now goes home from his job at the charcoal plant and goes to bed. He no longer swims, scuba dives, bowls or dances and does little fishing or hunting. He is unable to help around the house, and his relationship with his wife has suffered.

At the conclusion of the case, plaintiff requested damages in the amount of $716,752, which included $105,000 as lost future wages from plaintiff's trucking business; $388,752 as lost future wages from plaintiff's job in the charcoal factory; $200,000 for pain and suffering, $15,000 for future medical needs; and $7,957 for medical expenses already incurred. The jury returned a verdict in favor of plaintiff in the amount of $660,000, but found plaintiff twenty percent at fault in the accident. This reduced the verdict to $528,000, and judgment was entered accordingly. The trial court denied Wal–Mart's motion for remittitur, as well as plaintiff's motion to amend the judgment to include prejudgment interest. Both parties appeal.

Wal–Mart raises several points on appeal. First, Wal–Mart contends the trial court erred in failing to grant defendant's motion for directed verdict or judgment notwithstanding the verdict as plaintiff failed to make a submissible case that defendant had actual or constructive notice of the dangerous condition in time to prevent plaintiff's fall or that defendant did not have adequate safety methods.

■ Generally, in determining whether a plaintiff made a submissible case, the evidence is considered in the light most favorable to the plaintiff, giving him all reasonable beneficial inferences. *Resnik v. Blue Cross and Blue Shield of Missouri*, 912 S.W.2d 567, 571 (Mo.App.1996). In order to have made a submissible case, plaintiff had to show Wal–Mart knew or, by using ordinary care, could have known of the dangerous

condition and failed to use ordinary care to remove it, barricade it, or warn of it, and plaintiff sustained damage as a direct result of such failure. *See MAI 22.03 [1995 Revision].* Keeping in mind the applicable standard, the evidence revealed a dog food spill occurred earlier in the evening in the same aisle as plaintiff's fall. The food was of the sort sold in the large bags stacked on a low shelf in the aisle. After cleaning up the aisle using the implements kept in the area for such an occasion, Lowe returned the tools to their proper place behind the bags of dog food. However, she failed to determine where the dog food spill came from, specifically if one of the bags of food on the shelf had been ripped. This is so despite the common occurrence of spills in the pet food aisle and the absence of any other safety precautions, aside from the general safety sweeps that occurred every three hours. Soon after, plaintiff walked through the aisle and fell on dog food scattered on the floor.

■ In its brief, Wal–Mart focuses on the fact two employees were in the area of the spill five to ten minutes before it occurred and saw no spill, arguing this shows Wal-Mart could not have known of the spill through the use of ordinary care.[3] As acknowledged by Wal–Mart, the role time plays in determining whether a defendant had constructive notice of a dangerous condition has been greatly diminished. *Elmore v. Wal–Mart Stores, Inc.,* 812 S.W.2d 178, 180 (Mo.App.1991); *see Sheil v. T.G. & Y. Stores Co.,* 781 S.W.2d 778, 780 (Mo. banc 1989). In *Sheil,* the Court stated, "[T]he precise time will not be so important a factor. More important will be the method of merchandising and the nature of the article causing the injury." 781 S.W.2d at 780. Here, as in *Sheil,* Wal–Mart used a self-service form of merchandising where customers freely browse up and down the aisles. Merchandise was arranged in such a way so as to draw the customers' attention upward at the items on shelves, rather than at the floor. The item plaintiff slipped on was an item found in that particular aisle of the store and was an item that the store knew spilled frequently. The store took other precautions in another area of the store where spills were also frequent. The evidence showed such a spill had occurred merely twenty to thirty minutes before plaintiff slipped and fell in the same aisle. Moreover, Wawak's testimony revealed she was working in another department further down in an adjacent aisle, which afforded her a view of the aisle where plaintiff fell, giving rise to the inference the store had actual knowledge of the spill.

The cases cited by Wal–Mart are distinguishable. In *Elmore,* the dangerous condition was an opened pack of breath mints in the fabric department of a Wal–Mart store. In affirming summary judgment in favor of the store, the court pointed out the breath mints were laying on the floor in an area where such items were not merchandised five minutes after the area was cleaned, and plaintiff did not contest the item had been there only five minutes. 812 S.W.2d at 181–82. Thus, the plaintiff offered no evidence showing how the store could have had constructive or actual knowledge of the condition.

In *Head v. National Super Markets, Inc.,* 902 S.W.2d 305 (Mo.App.1995), the court reversed a directed verdict in favor of the defendant-store where a customer slipped on an item carried by the store, the evidence revealed the cleaning crew was off duty the hour before the plaintiff fell, and the area in which the plaintiff fell was an area where employees had an opportunity to observe the condition. *Id.* at 307–08. *Head* does not support Wal–Mart's position, but rather strengthens plaintiff's case, since the store had actual knowledge of the dog food spill and an employee was working down the aisle and within sight of the area where plaintiff fell.

The evidence showed Wal–Mart was a self-service store where customers continually handled and moved merchandise, including bagged dog food. This handling resulted in frequent spills of dog food in the aisle where customers walked. The sale method of the

---

**3.** We note the jury was entitled to give Bost's testimony the aisle was clear five minutes before plaintiff fell little weight where he conceded he did not see Wawak restocking shelves in the aisle despite the fact he would have walked directly past her.

store, the dangerous condition involved—here, dog food spilled in the aisle in which it was merchandised—and the frequency of the occurrence were sufficient to show dog food spills were a dangerous and foreseeable condition. *Sheil,* 781 S.W.2d at 781.

In its second point, Wal–Mart contends the trial court erred in submitting Instruction # 7, the verdict director, because it did not submit Wal–Mart had time to take remedial action, because it did not submit Wal–Mart failed to employ adequate safety methods, and because it was not supported by the evidence. Wal–Mart objected to Instruction # 7 only on the grounds it was not supported by substantial evidence. Thus, Wal–Mart did not preserve its current contention that the verdict director was erroneously given because it failed to submit certain propositions. *Rule 70.03; Pace Properties v. American Mfrs.,* 918 S.W.2d 883, 887 (Mo.App.1996). The remainder of Wal–Mart's claim is without merit.

Instruction # 7 read:

In your verdict you must assess a percentage of fault to defendant if you believe:

First, there was dog food on the floor of defendant's store and as a result the floor was not reasonably safe; and

Second, defendant knew, or by using ordinary care, could have known of this condition; and

Third, defendant failed to use ordinary care to remove it, barricade it, or warn of it; and

Fourth, as a direct result of such failure, plaintiff sustained damage.

*See 22.03 MAI–4th.* The evidence that supported the submission of the verdict director includes the following: after defendant fell in the pet food aisle, he saw several handfuls of dry dog food scattered on the floor. Bost, Wawak, and Lowe all testified they saw three pieces of dog food on the floor after plaintiff's fall. Lowe testified she had cleaned a spill of dog food just twenty to thirty minutes prior to plaintiff's fall. Wawak testified the previous spill was in the same aisle as plaintiff's fall.

Bost testified the store had various safety procedures in place to protect customers.

The store is self-service so customers are free to browse in the aisles and handle merchandise. Spills in the pet food aisle were common occurrences, happening at least once a week. Shopping cart wheels running into the bags near the floor could cause spills. Employees were instructed to clean any spills they found. In addition, because Wal–Mart recognized that if a product spilled once, it could spill again, employees were instructed to determine the source of any spill. Lowe did not determine the source of the earlier spill, despite testifying she did clean it up. In order to clean spills of pet food, employees were required to climb over the bags of dog food stacked on a low shelf to obtain the broom and dust pan. Other aisles where pet food and water were known to frequently spill had rubber mats placed on the floor.

After cleaning the spill, Lowe left the area. Bost testified he walked down the aisle and it was clean five minutes prior to plaintiff's fall, although the jury could have disregarded this testimony as Bost conceded he did not see Wawak working further down in the aisle, even though he would have walked right past her. Plaintiff then turned down the aisle. After glancing at the floor, he started walking down the aisle looking at the merchandise. After taking several steps, his feet went out from under him, and he fell on the floor landing on his back.

This evidence, viewed in the light most favorable to plaintiff, revealed there was a dog food spill in the aisle earlier that evening that had not been properly cleaned up, or which respilled because the employee failed to determine the original source of the spill, or the employee caused a new spill to occur when climbing over the bags of food to put away the broom and dust pan. The jury could have further concluded, due to the nature of the spills and their frequency, the store could have taken other or additional precautions to warn or protect customers but failed to do so. Accordingly, the evidence is sufficient to support the submission of plaintiff's verdict director.

In its third point, Wal–Mart claims the trial court erred in allowing plaintiff to

testify the reason he was raising his brother's children was because the children's parents had been killed in a car accident. Plaintiff testified he was raising three of his own children as well as two of his brother's children without objection by Wal–Mart. Plaintiff was allowed to testify as to the children's names and ages, all without complaint, as well as the fact that only one child currently resided in the home. When plaintiff's counsel asked plaintiff why he was raising his brother's children, Wal–Mart objected as to relevancy. The trial court overruled the objection, and plaintiff answered his brother and sister-in-law had been killed in a car accident. No other reference to the matter was made throughout the duration of the trial.

■ Generally, evidence of a party's family status is not admissible in actions for personal injuries. *Lewis v. Hubert,* 532 S.W.2d 860, 868 (Mo.App.1975). Here however, Wal–Mart failed to lodge any objection until the evidence of plaintiff's family status was already before the jury. A review of the record shows this information was disclosed as early as plaintiff's opening statement. When Wal–Mart did object to plaintiff's counsel's question regarding plaintiff raising his brother's children, it was only on the grounds of relevancy. Appellate courts have held an objection to a question should be so specific the trial court can recognize what rule of evidence is being invoked and why the rule would disallow a responsive answer. *Tauchert v. Ritz,* 909 S.W.2d 687, 690 (Mo. App.1995). A bare objection on the grounds of relevancy is too general to preserve the trial court's ruling for appellate review. *Id.* Here, plaintiff was allowed to introduce evidence he had raised his own children, his brother's children, their names and ages, and whether they were living at home, all without complaint by Wal–Mart. Wal–Mart's objection to plaintiff's next question on the grounds of relevancy leaves nothing for this Court to review; therefore, Wal–Mart's third point is denied.

■ Next, Wal–Mart contends the trial court erred in allowing Lowe to testify as to the frequency of dog food spills because there was no showing these spills were under substantially similar circumstances. Evidence of prior occurrences similar to the one that injured plaintiff may be admissible to establish notice to the defendant of the existence of a dangerous condition. *Fletcher v. City of Kansas City,* 812 S.W.2d 562, 564 (Mo.App.1991). The trial court is given wide latitude in determining whether such evidence is relevant and whether the circumstances bear sufficient resemblance to those causing the injury at issue. *Id.* The degree of similarity required for evidence being used to show defendant's notice of prior similar incidents is less demanding than the degree of similarity required for a series of prior incidents being used to show the same incident occurred on the date at issue. *Stacy v. Truman Medical Center,* 836 S.W.2d 911, 926 (Mo. banc 1992).

■ At trial and on appeal, Wal–Mart argues the number of times pet food had spilled in the past is not relevant to how this particular dog food spill occurred, whether defendant knew about it or cleaned it up, or how long it had been there. What Wal–Mart is arguing, however, is that the use of prior similar incidents cannot be used to show what happened in this particular incident, without a strong showing of similarity. *See id.* However, contrary to the argument propounded by Wal–Mart, the prior spills were not used to show the way the particular spill at issue occurred and how it was handled, but rather, the prior spills were relevant to demonstrate Wal–Mart's notice of the problem and the procedures it implemented or could have implemented to rectify the problem. There was ample evidence about stacking the bags of pet food so the ends were hanging into the aisle, the location of the broom and dust pan in the aisle, which required manipulating the bags of food, and about different measures taken in other departments where spills were frequent. Therefore, the trial court did not abuse its discretion in allowing plaintiff to present to the jury evidence of prior spills.

Wal–Mart's fifth point on appeal claims the trial court erred in allowing Dr. Hanaway's deposition testimony concerning what would be involved with and the cost of future surgery on plaintiff's back. Wal–Mart argues

Dr. Hanaway's testimony on these issues was too speculative and was used to prejudice the jury.

At Dr. Hanaway's deposition, plaintiff's counsel informed Dr. Hanaway he would be asking for his opinion within a "reasonable degree of medical certainty," although he was not going to repeat the standard with every question. Dr. Hanaway testified he understood. Later, plaintiff's counsel asked the question with which Wal–Mart now takes issue:

Q. Is there a possibility—when I say possibility, [fifty] percent or [fifty-one] percent or more chance that there might be a need for an operation in the future?

A. Yes. I mean, you say might or could or possibly yes. Of course, I can't say no.

While we agree the question could be better framed, we find Wal–Mart's challenge to lack merit, primarily because the record discloses several other questions and answers, some to and from Wal–Mart's own expert, which remove plaintiff's need for surgery from the realm of speculation.

Right before this exchange, plaintiff's counsel asked if there was any cure for plaintiff's back, to which Dr. Hanaway replied, " ... I suppose potentially operating on his back." When asked if plaintiff's condition was operable, Dr. Hanaway replied,

I have to say yes. Okay. Any herniated disc is operable. Now the second part of this is would [an] operation on this patient's upper lumbar/lower dorsal region help his total low back problem? And I'm not sure if it would.... [I]t may get rid of some of his pain.... So I'd hesitate to say that he should be operated on, although a herniated disc is an operable problem.

Dr. Hanaway also gave any operation a slim margin of success and stated he would not recommend one at this time. Dr. Hanaway's testimony further revealed he recommended plaintiff continue to seek treatment and be evaluated "no less than every four months."

Wal–Mart's own expert was asked to render his opinion, within a reasonable degree of medical certainty, whether plaintiff would benefit from surgery. Dr. Frumson replied,

" ... I think probably a surgery would be helpful, ...." A review of the experts' depositions read to the jury reveals each expert agreed plaintiff had an operable condition and future surgery might be needed, but neither was prepared to recommend it to plaintiff at the present time.

■ At the outset we note it is not improper " 'to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper.' " *Stephens v. Guffey,* 409 S.W.2d 62, 70 (Mo.1966)(citation omitted). Here, both experts agreed plaintiff's condition was operable as it existed at the time of trial. Both agreed a surgery would probably help plaintiff, and plaintiff's expert said he would not recommend one at this time, although that possibility was not discounted. The record indicates the experts' testimony in this case is no more speculative than that in other cases where surgery is possible in the future but has not yet been recommended to the patient. *See Bynote v. National Super Markets, Inc.,* 891 S.W.2d 117, 124–25 (Mo. banc 1995)(finding evidence of cost of surgery admissible where plaintiff's prognosis was poor and where neither expert recommended surgery unless plaintiff suffered a locked back); *Breeding v. Dodson Trailer Repair,* 679 S.W.2d 281, 283 (Mo. banc 1984)(finding evidence of cost of surgery admissible where doctor testified surgery would be necessary only if conservative treatment failed); *Stephens,* 409 S.W.2d at 69–70 (finding evidence of cost of surgery admissible where diagnosis of condition was tentative and surgery not yet recommended). Accordingly, Wal–Mart's contention the testimony was speculative and prejudicial is without merit.

■ Wal–Mart next argues the trial court plainly erred in allowing plaintiff to testify traces of blood in his urine indicated he had a contused kidney. Wal–Mart objected to the question on hearsay grounds, but failed to include this point of error in its motion for new trial, thereby preserving nothing for review. *Rule 78.07; Webb v. Missouri Highway and Transp. Com'n,* 947 S.W.2d 490, 491 (Mo.App.1997). There is no plain error in the admission of this testimo-

ny, however, as it was only cumulative to Dr. Hanaway's testimony, which was previously admitted without objection.

■ In its next to last point, Wal–Mart contends the trial court erred in denying its motion for remittitur. Generally, the issue of damages is primarily for the jury to decide. *Fust v. Francois*, 913 S.W.2d 38, 49 (Mo.App.1995). The trial court's grant of remittitur constitutes a ruling on the weight of the evidence. *Id.* Under section 537.068,[4] remittitur is appropriate where, after reviewing the evidence supporting the jury's verdict, the court finds the jury's award excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages. The trial court is given broad discretion in deciding whether remittitur should be ordered. *Fust,* 913 S.W.2d at 49. The appellate court will interfere only when the verdict is so excessive it shocks the conscience of the court and convinces the appellate court that both the jury and the trial court abused its discretion.

■ In determining whether an award is excessive, a number of factors are examined: (1) loss of income, both present and future; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards given and approved in comparable cases; and (7) the superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damages. *Tennis v. General Motors Corp.,* 625 S.W.2d 218, 229 (Mo.App.1981). Wal–Mart contends the verdict was excessive as plaintiff only lost wages in the amount of $852.48 and incurred medical expenses in the amount of $7,957.93. If these were the only factors considered, this Court might be persuaded the damages awarded by the jury in the amount of $660,-000 and reduced by twenty percent attributed to plaintiff's own fault for a total of $528,000 were excessive. However, the record is replete with evidence of the impact plaintiff's injury has had on his life and his ability to work. Plaintiff was a laborer with a high school education. He had to abandon his truck-driving business resulting in a loss

of over $100,000 in future wages. His doctors advised limiting his activities, including what he does as a mechanic at a charcoal plant. Plaintiff's aggregated future wages totaled almost $389,000. This evidence was before the jury, as was evidence of plaintiff's inability to engage in most of the life activities he enjoyed before his fall. Plaintiff was thirty-six at the time he was injured. He suffers from a herniated disc and multiple bulging discs along with their concomitant side effects. He takes painkillers for his condition and surgery is a possibility. Wal–Mart's own expert opined plaintiff's condition would worsen and characterized him as disabled. The jury and trial court were best able to assess the credibility of these witnesses and plaintiff's injuries. Nor is the verdict excessive in light of other awards. *See, e.g., Preston v. Wal–Mart Stores, Inc.,* 923 S.W.2d 426, 428 (Mo.App.1996)(upholding damage award of $275,000 to forty-nine year old woman for injuries to back); *Wright v. Fox–Stanley Photo Products, Inc.,* 639 S.W.2d 407, 410–11 (Mo.App.1982)(upholding damage award of $315,000 to forty-two year old man for injuries to back and arm).

Lastly, Wal–Mart contends we should reverse the judgment and remand for a new trial in light of the cumulative effect of the aforementioned errors, which served to prejudice Wal–Mart and deprive it of a fair trial. As previously discussed, the majority of Wal–Mart's claims of error are without merit; others have not been preserved. However, even taking into consideration the effect of the various evidentiary arguments put forth by Wal–Mart, we cannot say the cumulative effect of these rulings served to deprive Wal–Mart of a fair trial.

In his cross-appeal plaintiff claims the trial court erred in denying his motion to amend the judgment to include prejudgment interest pursuant to section 408.040. The provision allows a plaintiff in a tort case to recover prejudgment interest if the party makes an offer of settlement to the opposing party or his or her representative and any subsequent judgment in the case exceeds the amount specified in the settlement offer. *Section 408.040.2.* The provision requires the settle-

---

**4.** All statutory citations are to RSMo 1994 unless otherwise noted.

ment offer to be made in writing, to be sent by certified mail, and to be left open for sixty days unless rejected earlier. *Id.* If a prevailing plaintiff demonstrates compliance with the above, the plaintiff is entitled to prejudgment interest calculated from a date sixty days after the offer of settlement was made or from the date the offer is rejected without counteroffer, whichever is earlier. *Id.*

The trial court held a hearing on plaintiff's motion during which the following evidence was adduced: Plaintiff's original counsel[5] testified he sent a letter dated November 22, 1991, to Wal–Mart's representative offering to settle plaintiff's claim for $175,000.[6] It is undisputed that the letter was sent via regular mail, not certified mail. Counsel also testified and plaintiff introduced into evidence, subject to a hearsay objection, a December 20, 1991, letter from Wal–Mart's representative demonstrating receipt of plaintiff's settlement offer. Plaintiff sent another letter to Wal–Mart's representative on January 21, 1992, inquiring when Wal–Mart might have an answer as to his settlement offer. Counsel testified he telephoned Wal–Mart's representative on February 11, 1992, to determine the status of plaintiff's settlement offer and wrote another letter pursuant to those negotiations on March 11, 1992. Plaintiff's offer was ultimately rejected by Wal–Mart on March 13, 1992.[7]

■■■■ Wal–Mart contends the trial court's denial of plaintiff's request was proper because plaintiff failed to send the settlement offer by certified mail. Plaintiff relies on *Larabee v. Washington,* 793 S.W.2d 357 (Mo.App.1990), which held that certified mail was not required where the opposing party does not deny receipt of the offer or had actual notice of the offer. However, when statutory language is clear, courts must give effect to the language as written. Courts are without authority to read into a statute a legislative intent contrary to the intent made evident by the plain language. *M.A.B. v. Nicely,* 909 S.W.2d 669 (Mo. banc 1995). The court should regard the statute as mean-

ing what it says. *State ex rel. Bunker Resource, Recycling and Reclamation, Inc. v. Dierker,* 955 S.W.2d 931 (Mo. banc 1997). A court may not add words by implication to a statute that is clear and unambiguous. *Asbury v. Lombardi,* 846 S.W.2d 196 (Mo. banc 1993).

■■■ Moreover, the general rule is that prejudgment interest is not allowed in tort cases. *Vogel v. A.G. Edwards & Sons, Inc.,* 801 S.W.2d 746, 757 (Mo.App.1990). Section 408.040.2 is such an exception. The requirement for certified mail helps ensure that the recipient is made aware that the statute is being invoked to overcome the general rule against prejudgment interest. The certified mail requirement also helps minimize disputes as to whether, and on what date, the offer was, in fact, received.

Wal–Mart also contends that the trial court's ruling was appropriate because the terms of the offer prove the offer expired after thirty days. Although the plaintiff's initial letter stated plaintiff would like his attorney to file suit if a settlement could not be reached within thirty days, it did not link the withdrawal of the offer to the filing of the suit. Offers seeking to comply with section 408.040.2 should state clearly whether the offer is open for at least sixty days. An inference may have been drawn in this case that the offer would be withdrawn at the end of the thirty-day period. However, any such inference that the offer was only open for thirty days is overcome by the parties' continuing settlement negotiations. The statute merely requires the offer be left open sixty days. *Section 480.040.2.* Here, the offer was left open well beyond the sixty days required, until Wal–Mart rejected it on March 13, 1992.

Section 408.040.2 is clear and requires certified mail. Since plaintiff's letter was not sent by certified mail, the trial court correctly denied prejudgment interest. To the ex-

---

**5.** The attorney who represented plaintiff during the initial proceedings was not the attorney who represented him at trial.

**6.** Dr. Hanaway did not examine plaintiff until 1994.

**7.** Plaintiff did not file suit until June of 1992.

tent *Larabee* is contrary to this opinion, it is overruled.

The judgment is affirmed.

PRICE, LIMBAUGH, WHITE and HOLSTEIN, JJ., and PARRISH, Special Judge, concur.

BENTON, C.J., and COVINGTON and WOLFF, JJ., not participating.