John DOE, a/k/a Tony Twist, Appellant,

v.

TCI CABLEVISION, et al., Respondents.

No. SC 84856.

Supreme Court of Missouri, En Banc.

July 29, 2003.

John E. Bardgett, Sr., Robert D. Blitz, Thomas Avery, Clayton, James P. Holloran, St. Louis, for Appellant.

Michael A. Kahn, Peter W. Saisich, III, Geoffrey G. Gerber, Edwin D. Akers, Jr., Melanie R. King, St. Louis, for Respondents.

STEPHEN N. LIMBAUGH, JR., Judge.

Appellant Anthony Twist, also known as Tony Twist, is a former professional hockey player in the National Hockey League. After learning of the existence of a comic book, titled *Spawn*, that contained a villainous character sharing his name, Twist brought misappropriation of name and defamation claims against respondents, the creators, publishers and marketers of *Spawn* and related promotional products. Respondents defended on First Amendment grounds. The circuit court dismissed the defamation count, but allowed the misappropriation of name count to go to trial, which resulted in a jury verdict in favor of Twist in the amount of $24,500,000. The circuit court, however, granted respondents' motion for judgment notwithstanding the verdict and, in the alternative, ordered a new trial in the event that its judgment notwithstanding the verdict was overturned on appeal. A request for injunctive relief was also denied. After appeal to the Court of Appeals, Eastern District, this Court granted transfer. Mo. Const. art. V, sec. 10.

## I.

Tony Twist began his NHL career in 1988 playing for the St. Louis Blues, later

to be transferred to the Quebec Nordiques, only to return to St. Louis where he finished his career in 1999, due to injuries suffered in a motorcycle accident. During his hockey career, Twist became the League's preeminent "enforcer," a player whose chief responsibility was to protect goal scorers from physical assaults by opponents. In that role, Twist was notorious for his violent tactics on the ice. Describing Twist, a *Sports Illustrated* writer said: "It takes a special talent to stand on skates and beat someone senseless, and no one does it better than the St. Louis Blues left winger." Austin Murphy, *Fighting For A Living: St. Louis Blues Enforcer Tony Twist, Whose Pugilistic Talents Appear To Run In The Family, Doesn't Pull Any Punches On The Job,* SPORTS ILLUSTRATED, Mar. 16, 1998, at 42. The article goes on to quote Twist as saying, "I want to hurt them. I want to end the fight as soon as possible and I want the guy to remember it." *Id.*

Despite his well-deserved reputation as a tough-guy "enforcer," or perhaps because of that reputation, Twist was immensely popular with the hometown fans. He endorsed products, appeared on radio and television, hosted the "Tony Twist" television talk show for two years, and became actively involved with several children's charities. It is undisputed that Twist engaged in these activities to foster a positive image of himself in the community and to prepare for a career after hockey as a sports commentator and product endorser.

Respondent Todd McFarlane, an avowed hockey fan and president of Todd McFarlane Productions, Inc. (TMP), created *Spawn* in 1992. TMP employs the writers, artists and creative staff responsible for production of the comic book. *Spawn* is marketed and distributed month-ly by Image Comics, Inc., which was formed by McFarlane and others.

*Spawn* is "a dark and surreal fantasy" centered on a character named Al Simmons, a CIA assassin who was killed by the Mafia and descended to hell upon death. Simmons, having made a deal with the devil, was transformed into the creature Spawn and returned to earth to commit various violent and sexual acts on the devil's behalf. In 1993, a fictional character named "Anthony 'Tony Twist' Twistelli" was added to the *Spawn* storyline. The fictional "Tony Twist" is a Mafia don whose list of evil deeds includes multiple murders, abduction of children and sex with prostitutes. The fictional and real Tony Twist bear no physical resemblance to each other and, aside from the common nickname, are similar only in that each can be characterized as having an "enforcer" or tough-guy persona.

Each issue of the *Spawn* comic book contains a section entitled "Spawning Ground" in which fan letters are published and McFarlane responds to fan questions. In the September 1994 issue, McFarlane admitted that some of the *Spawn* characters were named after professional hockey players, including the "Tony Twist" character: "Antonio Twistelli, a/k/a Tony Twist, is actually the name of a hockey player of the Quebec Nordiques." And, again, in the November 1994 issue, McFarlane stated that the name of the fictional character was based on Twist, a real hockey player, and further promised the readers that they "will continue to see current and past hockey players' names in my books."

In April 1996, *Wizard,* a trade magazine for the comic book industry, interviewed McFarlane. In the published article, "Spawning Ground: A Look at the Real Life People Spawn Characters Are Based Upon," McFarlane is quoted as saying that

he uses the names of real-life people to create the identities of the characters. Brief biographies and drawings of the *Spawn* characters follow the McFarlane interview. The paragraph devoted to the "Tony Twist" character contained a drawing of the character accompanied by the following description:

First Appearance: Spawn # 6

Real–Life Persona: Tony Twist.

Relation: NHL St. Louis Blues right winger.

The Mafia don that has made life exceedingly rough for Al Simmons and his loved ones, in addition to putting out an ill-advised contract on the Violator, is named for former Quebec Nordiques hockey player Tony Twist, now a renowned enforcer (i.e."Goon") for the St. Louis Blues of the National Hockey League.

Below the character description was a photo of a Tony Twist hockey trading card, in which Twist was pictured in his St. Louis Blues hockey jersey.

In 1997, Twist became aware of the existence of *Spawn* and of the comic book's use of his name for that of the villainous character. On one occasion, several young hockey fans approached Twist's mother with Spawn trading cards depicting the Mafia character "Tony Twist." Subsequently, at an autograph session Twist was asked to sign a copy of the *Wizard* article in which McFarlane was interviewed and Twist's hockey trading card was pictured.

In October 1997, Twist filed suit against McFarlane and various companies associated with the *Spawn* comic book (collectively "respondents"), seeking an injunction and damages for, *inter alia*, misappropriation of name and defamation, the latter claim being later dismissed. McFarlane and the other defendants filed motions for summary judgment asserting First Amendment protection from a prosecution of the misappropriation of name claim, but the motions were overruled.

At trial, McFarlane denied that the comic book character was "about" the real-life Tony Twist despite the fact that the names were the same. McFarlane also denied that he or the other defendants had attained any benefit by using Twist's name. Twist, however, presented evidence that McFarlane and the other defendants had indeed benefited by using his name. For example, Twist introduced evidence suggesting that in marketing Spawn products, McFarlane directly targeted hockey fans— Twist's primary fan base—by producing and licensing Spawn logo hockey pucks, hockey jerseys and toy zambonis. On cross-examination, McFarlane admitted that on one occasion defendants sponsored "Spawn Night" at a minor league hockey game, where McFarlane personally appeared and distributed Spawn products, including products containing the "Tony Twist" character. Another "Spawn Night" was planned to take place at a subsequent NHL game, but the event never occurred. On the issue of damages, Twist, through purported expert testimony, offered a formula for determining the fair market value that McFarlane and the other defendants should have paid Twist to use his name. In addition, Twist introduced evidence that his association with the *Spawn* character resulted in a diminution in the commercial value of his name as an endorser of products. To that end, Sean Philips, a former executive of a sports nutrition company, testified that his company withdrew a $100,000 offer to Twist to serve as the company's product endorser after Philips learned that Twist's name was associated with the evil Mafia don in the *Spawn* comic book.

As noted, at the conclusion of the trial, the jury returned a verdict in favor of Twist and against the defendants jointly in

the amount of $24,500,000. On motions for a judgment notwithstanding the verdict or in the alternative a new trial, the circuit court overturned the verdict finding that Twist had failed to make a submissible case on the misappropriation of name count. The court further held that in the event the judgment notwithstanding the verdict was reversed on appeal, the motion for new trial was granted for evidentiary and instructional errors. Finally, the circuit court denied Twist's request for injunctive relief.

## II.

■■■ The tort of misappropriation of name is one of four recognized torts falling under the general heading of invasion of privacy. *Sullivan v. Pulitzer Broadcasting Co.*, 709 S.W.2d 475, 477 (Mo. banc 1986). The interest protected by the misappropriation of name tort "is the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or others." RESTATEMENT (SECOND) OF TORTS sec. 652C cmt. a (1977). Recently, development of the misappropriation of name tort has given rise to a separate yet similar tort termed the "right of publicity," which is said to "protect a person from losing the benefit of their [sic] work in creating a publicly recognizable persona." *Bear Foot, Inc. v. Chandler*, 965 S.W.2d 386, 389 (Mo.App.1998). Though facially similar, the protections afforded by each tort are slightly different: "the [misappropriation of name tort] protects against intrusion upon an individual's private self-esteem and dignity, while the right of publicity protects against commercial loss caused by appropriation of an individual's [identity] for commercial exploitation." 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION sec. 28.6 (4th ed.2003); *see also Bear Foot*, 965 S.W.2d at 389 ("In

contrast to the [misappropriation of name tort], the right of publicity is not intended to protect the person's feelings....")

■■■ Because the two torts differ in the type of protection that each seeks to provide, there are corresponding differences between the types of damages that may be recovered. In a misappropriation of name action, a plaintiff may recover damages not only for pecuniary loss, but also for mental or emotional distress and suffering. *See Haith v. Model Cities Health Corp. of Kansas City*, 704 S.W.2d 684, 688 (Mo.App.1986); RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 49 cmt. b (1995); MCCARTHY, TRADEMARKS sec. 28.6 (explaining that in misappropriation of name actions, damages are "measured by 'mental distress'—some bruising of the human psyche.") By contrast, in a right of publicity action, "the measure of damages properly focuses on the pecuniary loss to the plaintiff or the unjust pecuniary gain to the defendant." RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 49 cmt. b; *see also Bear Foot*, 965 S.W.2d at 389; *Haith*, 704 S.W.2d at 688.

In this case, Twist seeks to recover the amount of the fair market value that respondents should have paid to use his name in connection with Spawn products and for damage done to the commercial value—in effect the endorsement value—of his name. Therefore, Twist's case, though brought as a misappropriation of name action, is more precisely labeled a right of publicity action—a point that both parties appear to concede in their briefs.

■■■ Despite the differences in the types of damages that may be recovered, the elements of the two torts are essentially the same. To establish the misappropriation tort, the plaintiff must prove that the defendant used the plaintiff's name without consent to obtain some advantage.

*Nemani v. St. Louis Univ.*, 33 S.W.3d 184, 185 (Mo. banc 2000); *Haith*, 704 S.W.2d at 687. In a right of publicity action, the plaintiff must prove the same elements as in a misappropriation suit, with the minor exception that the plaintiff must prove that the defendant used the name to obtain a *commercial* advantage. RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 46; *see also* RESTATEMENT (SECOND) OF TORTS sec. 652C cmt. b (explaining that, in contrast, the misappropriation of name tort applies when plaintiff's name is used for commercial *or* non-commercial advantage). Given the similarity of elements of the two actions, Missouri cases analyzing the tort of misappropriation of name are pertinent to our recognition of a right of publicity claim.

In *Nemani*, the plaintiff, a research professor, brought suit against St. Louis University after the university used plaintiff's name in support of a federal grant application. This Court, reviewing the claim as a misappropriation of name tort, held that a defendant is liable under the tort when it uses a plaintiff's name without consent to obtain an advantage. 33 S.W.3d at 185. However, this Court was careful to point out that "[n]ot all uses of another's name are tortious":

> It is the plaintiff's name *as a symbol of [his] identity* that is involved here, and not [his name] as a mere name. Name appropriation occurs where a defendant makes use of the name to pirate the plaintiff's identity for some advantage.

*Id.* (Citations omitted.) (Emphasis added.) *See also Haith*, 704 S.W.2d 684; *Munden v. Harris*, 153 Mo.App. 652, 134 S.W. 1076 (1911).

In addition, though *Nemani* did not expressly so hold, an element of intent is implicit in the requirement that the identity be used to obtain an advantage. In a right of publicity case, plaintiff must prove that defendant intended to obtain a commercial advantage, and it is not enough to show that defendant incidentally obtained a commercial advantage by using plaintiff's name or that defendant had some other purpose in using plaintiff's name other than to obtain a commercial advantage. *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 811 (9th Cir.1997); *Benavidez v. Anheuser Busch, Inc.*, 873 F.2d 102, 104 (5th Cir. 1989); *Henley v. Dillard Dept. Stores*, 46 F.Supp.2d 587, 596 (N.D.Tex.1999); *see generally* RESTATEMENT (SECOND) OF TORTS sec. 652C cmt. d (explaining that a misappropriation of name or likeness claim stands only if the name or likeness was used "for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name of likeness").

■ To summarize, in view of *Nemani* and the earlier precedent of *Bear Foot*, and consistent with the RESTATEMENT (THIRD) OF UNFAIR COMPETITION, the elements of a right of publicity action include: (1) That defendant used plaintiff's name as a symbol of his identity (2) without consent (3) and with the intent to obtain a commercial advantage.

In this case, the circuit court's entry of JNOV was based on a finding that Twist failed to make a submissible case on the commercial advantage element. In addition, and though the court implicitly held otherwise, respondents claim that the grant of JNOV also was justified because Twist failed to prove that his name was used as "symbol of his identity."

■ "Generally, in determining whether a plaintiff made a submissible case, the evidence is considered in the light most favorable to the plaintiff, giving him all reasonable beneficial inferences." *Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 443 (Mo. banc 1998). It is "only where

there is a complete absence of probative fact to support the jury's conclusion" that this Court will decide that a submissible case was not made. *Giddens v. Kansas City Southern Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000).

### A.

Respondents' initial contention that Twist did not prove that his name was used as a "symbol of his identity" is spurious. To establish that a defendant used a plaintiff's name as a symbol of his identity, "the name used by the defendant must be understood by the audience as referring to the plaintiff." RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 46 cmt. d; *see also* J. THOMAS MCCARTHY, THE RIGHTS OF PUBLICITY AND PRIVACY sec. 4.48 (2d ed.2000) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)) (stating that the defendant's use of the name must be " 'something more than [an] amusing coincidence' "). In resolving this issue, the fact-finder may consider evidence including "the nature and extent of the identifying characteristics used by the defendant, the defendant's intent, the fame of the plaintiff, evidence of actual identification made by third persons, and surveys or other evidence indicating the perceptions of the audience." RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 46 cmt. d.

Here, all parties agree that the "Tony Twist" character is not "about" him, in that the character does not physically resemble Twist nor does the *Spawn* story line attempt to track Twist's real life. Instead, Twist maintains that the sharing of the same (and most unusual) name and the common persona of a tough-guy "enforcer" create an unmistakable correlation between Twist the hockey player and Twist the Mafia don that, when coupled with Twist's fame as a NHL star, conclusively establishes that respondents used his name and identity. This Court agrees. Indeed, respondent McFarlane appears to have conceded the point by informing his readers in separate issues of *Spawn* and in the *Wizard* article that the hockey player Tony Twist was the basis for the comic book character's name.

Arguably, without these concessions, some *Spawn* readers may not have made the connection between Twist and his fictional counterpart. However, other evidence at trial clearly demonstrated that, at some point, *Spawn's* readers did in fact make the connection, for both Twist and his mother were approached by young hockey fans under the belief that appellant was somehow affiliated with the *Spawn* character. On this record, respondents cannot seriously maintain that a good many purchasers of *Spawn* did not readily understand that respondents' use of the name referred to appellant. Accordingly, this Court holds that Twist presented sufficient evidence to prove that his name was used as a symbol of his identity.

### B.

As noted, the grant of JNOV was based on the commercial advantage element of the cause of action. Specifically, the court held that the record was devoid of credible evidence that respondents intended (1) "to injure Twist's marketability," (2) "to capitalize on the market recognition of the name," or (3) "derived any pecuniary benefit whatsoever from the use of that name."

At the outset, two of the premises for the circuit court's rationale are incorrect: Twist was under no obligation to prove that respondents intended to injure Twist's marketability or that respondents actually derived a pecuniary benefit from the use of his name. As explained, the commercial advantage element of the right of publicity focuses on the defendant's intent or purpose to obtain a com-

mercial benefit from use of the plaintiff's identity. But in meeting the commercial advantage element, it is irrelevant whether defendant intended to injure the plaintiff, McCarthy, Rights of Publicity sec. 3.28, or actually succeeded in obtaining a commercial advantage from using plaintiff's name, *see Brown v. Ames,* 201 F.3d 654, 661–62 (5th Cir.2000); *Henley,* 46 F.Supp.2d at 597; McCarthy, Rights of Publicity sec. 3.2. That said, it still was incumbent upon Twist to prove that respondents used his name intending to obtain a commercial advantage.

Twist contends, and this Court again agrees, that the evidence admitted at trial was sufficient to establish respondents' intent to gain a commercial advantage by using Twist's name to attract consumer attention to *Spawn* comic books and related products. As the Ninth Circuit noted in *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 416 (9th Cir.1996), "The first step toward selling a product or service is to attract the consumers' attention." (Citation omitted.) *See also id.* at 415 (holding that to the extent that defendant's use of plaintiff's name attracted consumers' attention to its product, defendant gained a commercial advantage); *Henley,* 46 F.Supp.2d at 597 (holding that the commercial advantage or benefit element is shown if by using plaintiff's name or likeness in the product defendant sought "to catch the eye of the consumer and make the [product] more interesting"); Restatement (Third) of Unfair Competition sec. 47 cmt. c. At a minimum, respondents' statements and actions reveal their intent to create the impression that Twist was somehow associated with the *Spawn* comic book, and this alone is sufficient to establish the commercial advantage element in a right of publicity action. *See Abdul–Jabbar,* 85 F.3d at 414–16; *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 835–36 (6th Cir.1983) (holding

that defendants violated plaintiff Johnny Carson's right of publicity when it used the phrase, "Here's Johnny," in its advertisement); *Henley,* 46 F.Supp.2d at 592–93 (holding in right of publicity case that defendant's use of the words, "Don's Henley," in advertisement was intended to elicit an association with plaintiff Don Henley).

But this is not all. At trial, Twist introduced evidence that respondents marketed their products directly to hockey fans. For example, respondents produced and distributed Spawn hockey jerseys and pucks and sponsored a "Spawn Night" at a minor league hockey game where other Spawn products were distributed, including products featuring the character "Tony Twist." Additionally, Twist points to McFarlane's statement in the November 1994 issue of *Spawn,* in which he promised readers that "they will continue to see current and past hockey players' names in [his] books." This statement, Twist correctly contends, amounts to an inducement to *Spawn* readers, especially those who are also hockey fans, to continue to purchase the comic book in order to see the name Tony Twist and other hockey players. This is evidence from which the jury could infer that respondents used his name to obtain a commercial advantage.

In support of the court's ruling that the evidence presented was insufficient to show that Twist's name was used to obtain a commercial advantage, respondents cite *Nemani, Haith,* and *Munden* to demonstrate the kind of commercial advantage that must be shown and to highlight that Twist's evidence was dissimilar. In *Nemani* and *Haith,* the defendants used the plaintiffs' names in grant applications for money; in *Munden,* the defendant used a picture of the plaintiff in an advertisement. Though it is true that respondents' intent to obtain a commercial advantage is not as

obvious as that found in *Nemani,Haith,* and *Munden,* the fact remains that to the extent that the evidence suggests that respondents used Twist's name to attract attention to their product, they did so to obtain a commercial advantage. Therefore, this Court holds that Twist presented sufficient evidence to establish that respondents used his name for a commercial advantage.

### III.

■ Having determined that Twist made a submissible case at trial, we next address whether the right of publicity claim is nevertheless prohibited by the First Amendment. Courts throughout the country have struggled with this issue. Mark S. Lee, *Agents of Chaos: Judicial Confusion in Defining the Right of Publicity–Free Speech Interface,* 23 Loy. L.A. ENT. L.REV. 471, 488–98 (2003). Of course, not all speech is protected under the First Amendment, and in cases like this, courts often will weigh the state's interest in protecting a plaintiff's property right to the commercial value of his or her name and identity against the defendant's right to free speech.

*Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), is the first and only right of publicity case decided by the Supreme Court. The case involved the unauthorized broadcast of a videotape of the plaintiff's 15–second "human cannonball" act during a nightly news program. The plaintiff brought suit under the state-recognized tort of right of publicity, alleging that the unauthorized broadcast amounted to an "unlawful appropriation" of his "professional property," and the defendant broadcasting company defended on First Amendment grounds. In balancing the respective parties' interests, the Court held, "Wherever the line in particular situ-

ations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Zacchini,* 433 U.S. at 574–75, 97 S.Ct. 2849. Because the *Zacchini* Court limited its holding to the particular facts of the case—the appropriation of plaintiff's "entire act"—it does not control the case at hand. Nonetheless, there are larger lessons that are certainly applicable.

First, the Court acknowledged, as had many lower courts previously, that the right of publicity is not always trumped by the right of free speech. Explaining the competing right of publicity interests, the Court observed that "[t]he rationale for protecting the right of publicity is the straightforward one of preventing unjust enrichment by the theft of goodwill. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Id.* at 576, 97 S.Ct. 2849.

Second, the Court distinguished claims for right of publicity or name appropriateness from claims for defamation like those adjudicated in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), and claims for "publicity that places plaintiff in a 'false light' " like that adjudicated in *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Because property interests are involved in the former categories but not the latter, *Zacchini,* 433 U.S. at 573, 97 S.Ct. 2849, the Court refused to apply the *New York Times v. Sullivan* "actual malice" standard that speech is privileged unless it was "knowingly false or was published with reckless disregard for the truth." *Id.* at

571, 97 S.Ct. 2849, *et seq.* As the Court later made clear in *Hustler, Zacchini* stands for the proposition that "the 'actual malice' standard does not apply to the tort of appropriation of a right of publicity...." 485 U.S. at 52, 108 S.Ct. 876.

Right to publicity cases, both before and after *Zacchini,* focus instead on the threshold legal question of whether the use of a person's name and identity is "expressive," in which case it is fully protected, or "commercial," in which case it is generally not protected. For instance, the use of a person's identity in news, entertainment, and creative works for the purpose of communicating information or expressive ideas about that person is protected "expressive" speech. *See, e.g., Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180, 1185 (9th Cir.2001); *Cardtoons v. Major League Baseball Players Ass'n,* 95 F.3d 959, 969–70 (10th Cir.1996); *Rogers v. Grimaldi, MGM/UA,* 875 F.2d 994, 1003–05 (2nd Cir. 1989). On the other hand, the use of a person's identity for purely commercial purposes, like advertising goods or services or the use of a person's name or likeness on merchandise, is rarely protected. *See, e.g., Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1002 (9th Cir.2001); *White v. Samsung Elec. Am., Inc.,* 971 F.2d 1395, 1397–99 (9th Cir.1992); *Midler v. Ford Motor Co.,* 849 F.2d 460, 462–64 (9th Cir.1988).

Several approaches have been offered to distinguish between expressive speech and commercial speech. The RESTATEMENT, for example, employs a "relatedness" test that protects the use of another person's name or identity in a work that is "related to" that person. The catalogue of "related" uses includes "the use of a person's name or likeness in news reporting, whether in newspapers, magazines, or broadcast news ... use in entertainment and other creative works, including both fiction and non-

fiction ... use as part of an article published in a fan magazine or in a feature story broadcast on an entertainment program ... dissemination of an unauthorized print or broadcast biography, [and use] of another's identity in a novel, play, or motion picture...." RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 47 cmt. c at 549. The proviso to that list, however, is that "if the name or likeness is used solely to attract attention to a work that is *not related* to the identified person, the user may be subject to liability for a use of the other's identity in advertising...." *Id.* (Emphasis added.)

California courts use a different approach, called the "transformative test," that was most recently invoked in *Winter v. D.C. Comics,* 30 Cal.4th 881, 134 Cal. Rptr.2d 634, 69 P.3d 473 (2003), a case with a remarkably similar fact situation. In that case, Johnny and Edgar Winters, well-known musicians with albino complexions and long white hair, brought a right of publicity action against defendant D.C. Comics for its publication of a comic book featuring the characters "Johnny and Edgar Autumn," half-worm, half-human creatures with pale faces and long white hair. On appeal, the California Supreme Court considered whether the action was barred by the First Amendment and employed " 'what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation.' " *Id.* at 475 (citing *Comedy III Productions, Inc. v. Gary Saderup, Inc.,* 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797, 799 (2001)). Concluding that the comic book characters "Johnny and Edgar Autumn" "are not just conventional depictions of plaintiffs but contain significant expressive content other than plaintiffs' mere likenesses," *id.* at 479, the Court held

that the characters were sufficiently transformed so as to entitle the comic book to full First Amendment protection.

The weakness of the RESTATEMENT's "relatedness" test and California's "transformative" test is that they give too little consideration to the fact that many uses of a person's name and identity have both expressive and commercial components. These tests operate to preclude a cause of action whenever the use of the name and identity is in any way expressive, regardless of its commercial exploitation. Under the relatedness test, use of a person's name and identity is actionable only when the use is solely commercial and is otherwise unrelated to that person. Under the transformative test, the transformation or fictionalized characterization of a person's celebrity status is not actionable even if its sole purpose is the commercial use of that person's name and identity. Though these tests purport to balance the prospective interests involved, there is no balancing at all—once the use is determined to be expressive, it is protected. At least one commentator, however, has advocated the use of a more balanced balancing test—a sort of predominant use test—that better addresses the cases where speech is both expressive and commercial:

> If a product is being sold that predominantly exploits the commercial value of an individual's identity, that product should be held to violate the right of publicity and not be protected by the First Amendment, even if there is some "expressive" content in it that might qualify as "speech" in other circumstances. If, on the other hand, the predominant purpose of the product is to make an expressive comment on or about a celebrity, the expressive values could be given greater weight.

Lee, *supra*, at 500.

The relative merit of these several tests can be seen when applied to the unusual circumstances of the case at hand. As discussed, Twist made a submissible case that respondents' use of his name and identity was for a commercial advantage. Nonetheless, there is still an expressive component in the use of his name and identity as a metaphorical reference to tough-guy "enforcers." And yet, respondents agree (perhaps to avoid a defamation claim) that the use was not a parody or other expressive comment or a fictionalized account of the real Twist. As such, the metaphorical reference to Twist, though a literary device, has very little literary value compared to its commercial value. On the record here, the use and identity of Twist's name has become predominantly a ploy to sell comic books and related products rather than an artistic or literary expression, and under these circumstances, free speech must give way to the right of publicity.

## IV.

The circuit court held that in the event that its grant of JNOV was determined to be in error on appeal, as previously held, respondents' alternative motion for a new trial was granted on several grounds. One such dispositive ground is instructional error in the verdict director given for the misappropriation of name count. The verdict director for this claim, which was the same for each defendant, read:

> Your verdict must be for plaintiff and against defendant Todd McFarlane if you believe:
>
> First, defendant Todd McFarlane intentionally used or published plaintiff's name, and
>
> Second, defendant Todd McFarlane derived advantage from the use or publication of plaintiff's name, or plaintiff suffered harm as a result of defendant

Todd McFarlane's use of publication of plaintiff's name, and

Third, plaintiff did not consent to the use of publication, and

Fourth, as a direct result thereof, plaintiff sustained damage.

In deciding whether the given verdict director was erroneous, it is helpful to again list the elements of the tort of right of publicity: (1) The defendant used plaintiff's name as a symbol of his identity (2) without consent (3) and with the intent to obtain a commercial advantage. Notably, the verdict director omitted any requirement that the jury find that defendant used plaintiff's identity rather than merely his name. This omission, however, did not prejudice respondents, as the evidence at trial so clearly established that appellant Tony Twist was the basis for the *Spawn* character's name.

However, a second and ultimately fatal flaw lies in the verdict director's failure to properly instruct the jury on the commercial advantage element of the tort. By requiring that the jury find only that respondents "derived advantage from the use or publication of plaintiff's name," as opposed to a finding that respondents used plaintiff's name "with the intent to derive" or "for the purpose of deriving" an advantage, the jury was allowed to render a verdict that could have been based on the mere incidental result of the use rather than the intentional result. Here, this seemingly fine distinction could well have borne different results. Although the evidence supported a finding that respondents used Twist's name and identity "with the intent to obtain a commercial advantage," alternatively, the jury could have found that respondents had no intent to obtain a commercial advantage—that there was a different purpose for using the name—and to the extent that some advantage was obtained, it was merely inciden-

tal. In fact, respondent McFarlane so testified in his defense, adding that the real reasons he used Twist's name were

one, it's a pretty cool name, and, two, it's easy to remember, it's an easy thing—cause I create a lot of characters, you need sort of easy ways to remember names.... And again, ... [with] Twist, you always sort of have a Twist ending. You just sort of come up with stuff that sort of, you know, semi-clever, if you will.

Because the verdict director allowed the jury to render a verdict for plaintiff without a finding that respondents *intended* to obtain a commercial advantage, and because the jury may well have determined that respondents obtained a commercial advantage even though they did not intend to do so, the verdict must be set aside.

## V.

■ In addition to the misappropriation of name claim, Twist sought equitable relief from the circuit court in the form of a permanent injunction prohibiting respondents from using his "name, commercial image, persona, autograph and/or likeness *for any purpose* without his consent." (Emphasis added.) The court denied equitable relief concluding, *inter alia,* that the injunction sought was overbroad because it could "interfere with legitimate and proper action by the defendants in the future." This Court holds that the circuit court was correct in doing so, because, as respondents state in their brief, the requested injunction attempted to prohibit respondents "from engaging in a variety of expressive activities unrelated to the subject matter of this lawsuit and undoubtedly protected by the First Amendment—*e.g.,* a parody of plaintiff, a commentary on his fighting style, a factual report on this lawsuit."

## VI.

For the foregoing reasons, the circuit court's judgment notwithstanding the verdict is reversed, the judgment granting a new trial is affirmed, the judgment denying injunctive relief is affirmed, and the case is remanded.

All concur.