John DOE a/k/a Tony Twist,
Respondent,

v.

Todd McFARLANE and Todd
McFarlane Productions,
Inc., Appellants.

No. ED 85283.

Missouri Court of Appeals,
Eastern District,
Division Five.

June 20, 2006.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 26, 2006.

Application for Transfer Denied
Dec. 19, 2006.

Thomas C. Walsh, James F.Bennett, Michael A. Kahn, Geoffrey Gerber, St. Louis, for appellants.

James P. Holloran, Saint Louis, Robert D. Blitz, John E. Bardgett, R. Thomas Avery, Thomas W. Rynard, Clayton, for respondent.

## *OPINION*

GLENN A. NORTON, Chief Judge.

A jury rendered a verdict against Todd McFarlane and Todd McFarlane Productions, Inc. ("TMP") on Tony Twist's right of publicity claim involving the use of his name in a comic book. McFarlane and TMP appeal. We affirm.

## I. BACKGROUND

McFarlane is the creator of the very successful *Spawn* comic book series, which his production company, TMP, issues. Twist is a former professional hockey player who played for the Quebec Nordiques and the St. Louis Blues. One of the characters in the *Spawn* comic book is named "Tony Twist," a mafia boss who first appeared unnamed in a 1992 issue and then as "Antonio Twist." Shortly thereafter, he was referred to as "Tony Twist" and then "Antonio Twistelli," and these names were meant to be interchangeable. In response to fan letters and in an interview for a magazine article, McFarlane said that he named the character after Twist the hockey player.

This appeal arises from the second trial of Twist's claims against McFarlane and TMP for using his name without his consent. In the first trial, the jury found McFarlane, TMP and other defendants associated with *Spawn* products liable for misappropriating Twist's name and awarded Twist $24.5 million. But the trial court entered a judgment notwithstanding that verdict because Twist had not made a submissible case. On appeal, the Supreme Court set forth the elements of Twist's cause of action, which was properly called a right of publicity claim, and determined that Twist had made a submissible case. *Doe v. TCI Cablevision*, 110 S.W.3d 363, 369–72 (Mo. banc 2003). The Court then addressed the defendants' claim that use of Twist's name in the comic book was expressive speech entitled to protection under the First Amendment. The Court adopted a predominant use test to determine whether speech like this, which is both expressive and commercial, is protected. *Id.* at 374. The Court concluded that, on the record in that case, the use of Twist's name was predominantly a ploy to sell comic books and related products rather than an artistic or literary expression. *Id.* Under those circumstances, the speech was afforded no protection. *Id.* at 374, 376. Nevertheless, the case was remanded for a new trial based on an instructional error. *See id.* at 375–76.

After the second trial, the jury rendered a verdict in Twist's favor and against McFarlane and TMP [1] and awarded Twist $15 million in damages. McFarlane and TMP moved for a judgment notwithstanding the verdict, arguing, among other things, that use of the name "Tony Twist" was not actionable because its predominant purpose was artistic, not commercial,

---

1. The jury found that the other defendants—TMP International, Inc., Todd McFarlane Entertainment, Inc. and Image Comics, Inc.— were not liable. Initially, Twist appealed those judgments, but that appeal has been voluntarily dismissed.

and therefore was protected speech under the test set forth in *Doe.* They also sought, in the alternative, a new trial. The trial court denied those motions, and McFarlane and TMP appeal. On appeal, they challenge the trial court's finding that the evidence demonstrated that the predominant purpose for using Twist's name was commercial and not artistic and therefore not protected speech under the First Amendment; they argue that the trial court erred in admitting expert testimony regarding Twist's lost endorsement deals and his entitlement to royalties from *Spawn* products because of the defendants' use of his name; they challenge the admission of a magazine article regarding the naming of *Spawn* characters and admission of the HBO animated *Spawn* series; and they contend that the damages instruction was erroneous.

## II. DISCUSSION

### A. First Amendment Protection

On appeal of cases involving the First Amendment, we are obliged to determine for ourselves whether the speech at issue is protected by independently reviewing the entire record. *See Bose Corporation v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Where the trial court has reviewed the evidence on a motion for judgment notwithstanding the verdict and made an express finding about constitutional facts—here, in denying the motion for judgment notwithstanding the verdict, the court expressly found that the evidence showed the predominant purpose for using Twist's name was commercial and not artistic—then our independent review must include due deference to the trial court's opportunity to observe the demeanor of the witnesses. *See Warner v. Kansas City Star Company,* 726 S.W.2d 384, 390 (Mo.App. W.D.1987); *see also Bose,* 466 U.S. at 499–500, 104 S.Ct. 1949.

In the first appeal of this case, the Supreme Court adopted a predominant use test for determining whether the use of a person's name and identity is protected speech under the First Amendment. *Doe,* 110 S.W.3d at 374. The Court rejected other tests that grant First Amendment protection to the use of another's name if it is expressive in any way, regardless of commercial exploitation, and instead found a "more balanced balancing test":

> At least one commentator, however, has advocated the use of a more balanced balancing test—a sort of predominant use test—that better addresses the cases where speech is both expressive and commercial:
>
> > If a product is being sold that predominantly exploits the commercial value of an individual's identity, that product should be held to violate the right of publicity and not be protected by the First Amendment, even if there is some "expressive" content in it that might qualify as "speech" in other circumstances. If, on the other hand, the predominant purpose of the product is to make an expressive comment on or about a celebrity, the expressive values could be given greater weight.

*Id.* (quoting Mark S. Lee, *Agents of Chaos: Judicial Confusion in Defining the Right of Publicity–Free Speech Interface,* 23 LOY. L.A. ENT. L.REV. 471, 500 (2003)). In applying this test, the Court first noted that although Twist had made a submissible case that the defendants used his name and identity for a commercial advantage, there was an expressive component to the name in that it was a metaphorical reference to tough-guy enforcers. *Doe,* 110 S.W.3d at 374. Yet, the defendants agreed that use of Twist's name was not a parody

of Twist or other expressive comment. *Id.* Thus, the Court concluded that "the metaphorical reference to Twist, though a literary device, has very little literary value compared to its commercial value. On the record here, the use and identity of Twist's name has become predominantly a ploy to sell comic books and related products rather than an artistic or literary expression." *Id.*

■ McFarlane and TMP contend that the Supreme Court's test is a balancing of values, which requires courts to " 'value' the artistic worth of the use of someone's name against the commercial value of that use." They argue *that there was ample* evidence that the name "Tony Twist" had artistic value, which far outweighed the sparse evidence that the name had any commercial value. They rely heavily on literary expert opinions to demonstrate artistic value. To demonstrate a lack of commercial value, they argue that Twist was an obscure hockey player in Canada with no endorsement deals during the "critical" years—namely, the year the "Tony Twist" character first appeared in the comic book and the year McFarlane referred to Twist the hockey player in response to fan letters. Thus, they claim they are entitled to First Amendment protection under the predominant use test.[2]

■ McFarlane and TMP misunderstand the test. The thrust of the predominant use test is to distinguish between commercial exploitation and genuine expressive comment. *See* Lee, *supra,* at 500 (restating the test as "whether the publicity right is being exploited or the individual is being commented on."). It is simply unnecessary to determine the name's particular commercial value in a monetary sense by reference to the plaintiff's fame at a particular time—the way McFarlane and TMP suggest—or to determine the name's artistic worth by way of a third-party's opinion as to the name's literary elements—the way McFarlane and TMP suggest—in order to decide whether the defendants' purpose in using the name was exploitive or expressive. This is ·evident from the Supreme Court's application of the test to the record of the first trial in this case.

The Court began its analysis with a reference to the same evidence that it had found was sufficient to make a submissible case on the element of commercial advantage: "[a]s discussed, Twist made a submissible case that respondents' use of his name and identity was for a commercial advantage." *Doe,* 110 S.W.3d at 374. In reaching that conclusion, the Court had cited to evidence that the defendants' "statements and actions reveal their intent to create the impression that Twist was

---

**2.** McFarlane and TMP also contend, alternatively, that the test adopted in *Doe* violates well-established First Amendment jurisprudence holding that the scope of protection does not depend on the quality of the expression or on whether the speaker had a "profit motive." Rather, they argue, a finding that the work has any "non-trivial artistic value" should be sufficient to invoke First Amendment protection. The reliance on the existence of *any* "artistic value" for determining whether the use of a name is protected was precisely what the Supreme Court rejected in *Doe* when it declined to follow those tests that grant First Amendment protection to the use

of a person's name that is "in any way expressive, regardless of commercial exploitation" and instead adopted the predominant use test that requires consideration of commercial exploitation. *Id.* at 374. Thus, artistic value alone is not sufficient to invoke the First Amendment under the predominant use test. McFarlane and TMP admit that they only included this argument in their brief to preserve it for review by the Supreme Court in the event the case is transferred and acknowledge that we have no authority to overrule the Supreme Court's decision in *Doe.* This point is denied.

somehow associated with the *Spawn* comic book," that they marketed *Spawn* products to hockey fans and that McFarlane induced readers to purchase the comic book in order to see Twist's and other hockey players' names. *Id.* at 371. Nowhere in the Court's analysis is there any discussion of what Twist's name was commercially worth—in a monetary sense—at any given time. Thus, whether the defendants' predominant purpose was to exploit the commercial value of the plaintiff's name cannot depend on how much monetary value the name had or the Supreme Court would have discussed that.

The evidence at the second trial was virtually the same regarding McFarlane's and TMP's intent to gain a commercial advantage by using Twist's name. The first indication of McFarlane's intent in naming the "Tony Twist" character was in McFarlane's responses to fan letters in two 1994 issues of *Spawn*. In one, a fan asked about naming characters after people McFarlane knew, to which he responded:

> The answer to your first set of questions is easy—if I don't put my friends and family's names in my book then who's going to. The great thing about writing and drawing your own book is you get to have as much fun with it as you want. That being the names you choose for each character. Whenever I choose a name I try to have a little bit of a play on it which includes amongst other things, I am a big hockey fan, and a lot of my characters have been named after current NHL hockey players. For example, Antonio Twistelli a.k.a. Tony Twist is actually the name of a hockey player for the Quebec Nordiques. There have been many hockey refer-

ences throughout my career in my books.

In the other letter, a fan asked "Is it me or are there a lot of Quebec Nordiques in your stories?" McFarlane responded:

> Good eyes, Rob. As a self-proclaimed hockey fanatic you are absolutely correct in noticing hockey players' names in my book. Sometimes I use their full names and sometimes just their last. Let's make a check list of some of the names I've used so far: Burke, Williams, Sakic, Twist, Linden, Roenick, and a few others I can't think of right now. I love hockey!! So the current strike is killing me right now. But, you will continue to see current and past hockey players' names in my books. This is not just particular to Spawn either as I had Wayne Gretsky all over the Spider–Man book I wrote.

Then, in 1996, *Wizard* magazine issued a special *Spawn Tribute* edition, which contained an article about how McFarlane comes up with character names.[3] Therein, McFarlane was quoted as saying that he names his characters after friends and family. The article contained a picture and biography of "Anthony 'Tony Twist' Twistelli" and his real-life persona, Tony Twist. The text of the biography indicated that the character was "named for former Quebec Nordiques hockey player Tony Twist, now a renowned enforcer (i.e., "goon") for the St. Louis Blues of the National Hockey League." All of the information in the article, except the word "goon," came from an interview with McFarlane.

Throughout his depositions and live testimony before and during the first and second trials,[4] McFarlane downplayed the

---

**3.** McFarlane and TMP have challenged the admission of the *Wizard* article at trial. As discussed in section II.C.1 of this opinion, *infra,* we find no error in its admission.

**4.** At the second trial, Twist offered into evi-

importance of the fact that there was a hockey player named Tony Twist—admitting that he had the player in mind, at least subconsciously, but that he did not intentionally name the character after him. According to McFarlane, it was just a coincidence. Although he agreed that everything he does is aimed at making his products more interesting and marketable, McFarlane did not believe that characters' names persuade consumers to buy the comic books. McFarlane also discussed some of the various promotional activities by TMP and his other companies, including a *Spawn* night at a minor league hockey game where McFarlane signed autographs and they gave away hockey pucks and jerseys with *Spawn* logos, *Spawn* comic books and other *Spawn* products. The intention of *Spawn* night was to promote *Spawn* products to hockey fans.

It is undisputed that the above evidence was sufficient to make a submissible case that McFarlane and TMP used Twist's name and identity to gain a commercial advantage. There was, as there was in the first trial, also testimony tending to show that use of the name had an "expressive component." *See Doe*, 110 S.W.3d at 374. In addition to admitting that he may have inadvertently had Twist in mind when he named the character, McFarlane also gave various other explanations at the first trial and second trials for how he named the "Tony Twist" character: he needed a Sicilian character; he knew about a gangster enforcer from the 1940s nicknamed Kid Twist, who took his name from a turn-of-the-century mobster with the same name; he was aware that another comic book author used alliteration when naming characters; he picked the name "Tony Twist" over other more famous hockey players

with alliterative names because it is a "cool" name and easy to remember for a character that would always have a twist ending. McFarlane acknowledged that in neither of the responses to fan letters, nor in his interview for the *Wizard* article, had he mentioned any reason for naming the character other than the hockey player named Twist.

When addressing the "expressive component," the Supreme Court mentioned only that use of Twist's name and identity was a metaphorical reference to tough-guy enforcers. *Id.* at 374. The Court made no mention of the other reasons for using Twist's name that McFarlane had testified about at the first trial, of which the Court was clearly aware as evidenced by its discussion of that testimony in another part of the opinion regarding the verdict director. *See id.* at 375. That the Court did not rely on any of that testimony in its application of the predominant use test demonstrates that type of evidence was not important to the analysis. More important was the fact that the defendants denied having intended to make an expressive comment about Twist:

> And yet, respondents agree (perhaps to avoid a defamation claim) that the use was not a parody or other expressive comment or a fictionalized account of the real Twist. As such, the metaphorical reference to Twist, though a literary device, has very little literary value compared to its commercial value.

*Id.* at 374. Here, too, there is no claim by McFarlane or TMP that use of the name "Tony Twist" for this character was intended as a parody, expressive comment or fictionalized account of Twist the hockey player. Thus, we need not give the "expressive value" of the name greater weight

dence McFarlane's deposition testimony from before the first trial, his testimony from the first trial and his deposition testimony from

after the first trial; McFarlane also testified live in his defense at the second trial.

than the evidence of commercial exploitation.

This is true even when considering the additional testimony presented at the second trial from two English professors, on which McFarlane and TMP rely in this appeal. Based on the Supreme Court's approach in the first appeal, this additional evidence adds little if anything to the analysis. These experts testified that the name "Tony Twist" could be a reference to the fact that, as a villain, the character is twisted; that it sounds ethnic and may refer to the character's Italian heritage; and that it may be part of a tradition of giving villains alliterative names. These were the same literary devices McFarlane alluded to in his testimony during the first trial, which the Supreme Court disregarded in its analysis. The experts also pointed out that the name may refer to the literary character Oliver Twist, who had a similar circumstance to the character "Tony Twist," and that the name calls attention to itself and sounds fictional and "cartoonish." But neither of these elements was cited by McFarlane as part of his reason for choosing the name, and neither expert could testify about McFarlane's purpose or intent in choosing to use the name "Tony Twist." It is not one's objective assessment of the name's literary qualities that is important under the predominant use test, but rather the defendant's intention in using the name.

To the extent the literary experts' testimony is at all relevant, on balance, it does not outweigh the evidence that McFarlane named the character after the hockey player and that use of the name was part of his and TMP's marketing efforts to hockey fans. To the extent McFarlane's own claims about his artistic reasons for using the name "Tony Twist" are significant, it was well within the trial court's discretion to find that his testimony lacked credibility. For instance, the timing of McFarlane's claims of artistic motivation is suspicious. Before the lawsuit was filed, McFarlane stated only that the character "Tony Twist" was named after the hockey player with the same name; after the lawsuit was filed, he claimed that he chose the name for additional literary reasons. Moreover, although McFarlane said alliteration was a factor in naming Twist—and that it was just coincidence that he picked the letter "T" and the names "Tony" and "Twist" to accomplish that element, which happened to be the name of a real person—none of the other hundreds of characters in the comic book had first and last names that started with the same letter.

Because we are bound by the law set forth in *Doe* and because the evidence before the Supreme Court in that case and before us in this case is virtually the same with respect to what that Court found relevant to the predominant use test, we reach the same conclusion as the Supreme Court in our application of that test to these facts. The predominant purpose of the use of the name "Tony Twist" was to sell comic books and related products and not to make an expressive comment about Twist the hockey player. Therefore, use of the name is not entitled to First Amendment protection. Point denied.

## B. Admissibility of Expert Testimony

McFarlane and TMP challenge the admission of expert testimony regarding damages.[5] The admission of expert

---

5. In a letter filed after briefing on this appeal, Twist asserted that the challenges to these experts' testimony have not been preserved for appeal because no objection was made after the experts stated their qualifications at trial, there was no motion to strike the testimony and no other request for the court to rule on any objections. While Twist is correct

opinion testimony is a matter within the discretion of the trial court, and this Court will not interfere with that discretion unless it plainly appears that it has been abused. *Eltiste v. Ford Motor Company*, 167 S.W.3d 742, 751 (Mo.App. E.D.2005). The admission of expert testimony is governed by section 490.065 RSMo 2000. *State Board of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 153 (Mo. banc 2003). That statute provides, in relevant part:

1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

Section 490.065.

�merge In determining the admissibility of expert opinions under section 490.065.3, trial courts generally are expected to defer to the expert's assessment of what facts or data are reasonably reliable in their field. *Goddard v. State*, 144 S.W.3d 848, 854 (Mo.App. S.D.2004). But the court must also independently determine whether the facts and data on which an expert's opinion is based are "otherwise reasonably reliable" as subsection 3 requires. *McDonagh*, 123 S.W.3d at 156, 158. In this determination, the trial court looks beyond the expert's assessment of reliability. *Goddard*, 144 S.W.3d at 854. "As a rule, questions as to the sources and bases of the expert's opinion affect the weight, rather than the admissibility, of the opinion, and are properly left to the jury." *Wulfing v. Kansas City Southern Industries, Inc.*, 842 S.W.2d 133, 152 (Mo. App. W.D.1992), *overruled on other grounds by Executive Board of Missouri Baptist Convention v. Carnahan*, 170 S.W.3d 437, 447 n. 5 (Mo.App. W.D.2005). Only in cases where the sources relied on by the expert are "so slight as to be fundamentally unsupported," should the opinion be excluded because testimony with that little weight would not assist the jury. *Wulfing*, 842 S.W.2d at 152; *see also Goddard*, 144 S.W.3d at 854. Still, an expert's opinion must be founded on substantial information, not mere conjecture or speculation, and there must be a rational basis for the opinion. *Rigali v. Kensington Place Homeowners' Association*, 103 S.W.3d 839, 845 (Mo.App. E.D.2003).

On appeal, McFarlane and TMP insist that the opinions of Michael Brooks and Brian Till were not based on facts and data

---

that the record does not reflect any challenge at any time to either of these experts' qualifications, no such argument is raised in this appeal either. Rather, the challenges to the testimony on appeal are precisely those raised by the defendants in the trial court. They filed motions before trial to strike both experts' opinions on the same grounds set forth in this appeal. Then they objected at trial before each expert testified, referring to the grounds stated in those pre-trial motions. The court overruled those objections and ordered that the record would reflect that the objections were continuing. In post-trial motions, the defendants again raised these issues. Admissibility of these opinions, therefore, has been properly preserved for review.

reasonably relied on by experts in the field. But the record shows otherwise. Brooks testified that the materials he relied on in forming his opinions were the type of documents and information that he and others in the field rely on in forming the type of opinions he formed for this case. Till testified that the materials he relied on were "the kind of materials that people in my profession rely on in forming opinions and find reliable to forming these opinions." The defendants put on no evidence to contradict these assertions. In this situation, the experts' own assessments are entitled to deference. *See Goddard,* 144 S.W.3d at 854. Thus, to determine admissibility, the only remaining question is whether the facts and data on which these experts based their opinions were otherwise reasonably reliable. *See id.; see also McDonagh,* 123 S.W.3d at 156, 158.

### 1. Brooks's Testimony Regarding Range of Lost Endorsement Opportunities

Brooks testified on behalf of Twist regarding lost endorsements. Brooks is a retired Anheuser–Busch marketing executive and corporate officer. His qualifications as an expert by way of his knowledge, skill, experience, training or education are not questioned on appeal.[6] Brooks stated that using athletes and entertainers as endorsers or spokespeople can increase brand awareness and thereby provide a company a commercial advantage over its competitors. It is "vitally important," Brooks testified, that the celebrities not have any negative connotation associated with them so as not to offend any potential consumer.

In forming his opinions for this case, Brooks reviewed extensive amounts of material, including McFarlane's comic books, the HBO animated *Spawn* series, deposition and other testimony, some of the defendants' internal documents and some information about Twist's career. He testified that these are the types of documents and information that he and others in the field rely on in forming the type of opinions he formed for this case. Brooks also relied on his education, experience, training and expertise in consumer product marketing to form his opinions.

Brooks opined that Twist had all the qualities necessary to be an endorser for or associated with major brand products based on his engaging personality, ability to interact with consumers, tremendous base of hockey fans and work ethic. He also opined that utilization of Twist's name by the defendants was a targeted marketing effort, the purpose of which was to gain a commercial advantage by attracting hockey fans to their products. Brooks believed that major brand products would not work with Twist because the defendants associated him with *Spawn* products. Finally, he stated that it was his opinion that Twist has and will suffer the loss of $3 million to $50 million as a result of the defendants associating him with *Spawn* products.

McFarlane and TMP contend on appeal that Brooks's testimony was speculative, conjectural, unreliable and did not assist the jury. They also argue that his testimony lacked the reasonable certainty required to prove damages for lost future

**6.** In his various positions at Anheuser–Busch over the years, Brooks worked with professional athletes, entertainers and other celebrity endorsers and spokespeople for the company and was responsible for selecting the celebrities the company would use to promote its products. He understood the process of selecting celebrity endorsers, what functions they performed on the company's behalf, how consumer interaction was generated and what benefit the celebrities brought to the company.

earnings. We address their specific arguments regarding each of Brooks's opinions in turn.[7]

### a. Brooks's opinion regarding intent

■ McFarlane and TMP challenge Brooks's opinion that the defendants' use of Twist's name was intended to gain a commercial advantage with hockey fans on the ground that intent is a jury question outside the scope of proper expert testimony and that the opinion was unsupported by any facts. We disagree. The statute expressly provides that otherwise admissible expert testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Section 490.065.2. But the testimony must nevertheless be helpful to the jury:

> If the subject on which the expert intends to testify is one which lay jurors are not inclined to be familiar with, so the opinion would be helpful to the jury, it is not a valid objection that the expert's opinion goes to the ultimate issue for the jury to decide, or that the expert's opinion invades the province of the jury. On the other °hand, if the subject is one of everyday experience, where the jurors are competent to decide the issues, then opinion testimony is properly rejected.

*Guzman v. Hanson,* 988 S.W.2d 550, 554 (Mo.App. E.D.1999) (internal citations and quotation marks omitted). The subject about which Brooks testified—the use of

celebrities to endorse or otherwise gain commercial advantage in the marketplace—is not a subject of everyday experience with which a lay juror would be inclined to be familiar. Thus, it is not a valid objection that his opinion embraced issues of ultimate fact such as intent.

McFarlane and TMP cite to *Bowman v. McDonald's Corporation,* 916 S.W.2d 270 (Mo.App. W.D.1995), to support the proposition that an opinion about intent is not proper expert testimony. In that case, the plaintiff was attacked in the parking lot of a McDonald's restaurant by two unknown assailants who demanded the plaintiff's car keys, shot the plaintiff as he attempted to flee and robbed him. *Id.* at 274–75. In his suit against the owner of the property and the operator of the restaurant, the plaintiff sought to introduce an expert opinion that the assailants' initial intent was to rob the restaurant, not to steal the plaintiff's car. *Id.* at 282. The trial court refused to allow this opinion on the basis that it invaded the province of the jury. *Id.* The appellate court found that testimony regarding the intent of the assailants was not relevant and that the jury was perfectly capable of reaching an intelligent conclusion on that issue based on other evidence before it. *Id.* at 283. The *Bowman* opinion says nothing about whether a defendant's intent is an ultimate issue on which an expert cannot testify, despite the language of section 490.065.2, and is not on point to the issue in this appeal.[8]

---

**7.** Although they have asserted that all of Brooks's opinions were inadmissible, McFarlane and TMP provide no supporting argument regarding the first opinion—that Twist had all the qualities necessary to be an endorser for or associated with major brand products—other than to say in their reply brief that it was "unreliable" because it was based on the careers of a football player and a race car driver, with whom Twist had nothing in common. We disagree. This opinion was supported by more than just Brooks's com-

parison to these other athletes. Rather, he testified that Twist had acquired a national fan base. He mentioned these other athletes as examples of people who did not have an existing fan base at the time they became associated with a national brand. There was no abuse of discretion in admitting this opinion.

**8.** *Bowman* was overruled on grounds unrelated to the expert opinion. *See Richardson v.*

McFarlane and TMP also cite *DePaepe v. General Motors Corporation,* 141 F.3d 715 (7th Cir.1998), which is equally unenlightening regarding the admissibility of expert opinions on ultimate issues under section 490.065.2. In *DePaepe,* an engineer testified that the defendant had reduced the amount of padding in its sun visors—which the plaintiff claimed was defective and contributed to his injuries in a car crash—in order to save money. *Id.* at 717. The trial court believed that the expert was allowed to speculate, overruling the defendant's objection to this "motive or purpose" testimony. *Id.* The Seventh Circuit disagreed, concluding that because he lacked any scientific basis for his conclusions, the expert could not speculate about the defendant's motives. *Id.* The *DePaepe* opinion says nothing about intent or motive being an ultimate issue that is *per se* outside the scope of expert testimony despite section 490.065.2 or the similar Federal Rule of Evidence. *See* FED.R.EVID. 704. Rather, the Court in *DePaepe* reached its conclusion because the expert's opinion lacked the requirements for admissibility of scientific expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)—which is not instructive to the issue in this appeal.

The argument that Brooks's opinion regarding intent was unsupported by any facts is belied by the record, which demonstrates that his opinion was based on his experience, his review of the defendants' products and other documents and McFarlane's testimony. Brooks testified that the defendants' marketing efforts were "consistent with target marketing efforts that I have previously used in my career." He had been involved in numerous target marketing campaigns, and it was common practice to identify an opportunity in the marketplace and tailor the marketing efforts towards that opportunity. Brooks relied on the defendants' internal documents, products and deposition testimony showing the defendants' marketing efforts towards hockey fans, which were part of the fan base for *Spawn* products. In particular, he cited the naming of numerous characters after hockey players, McFarlane's responses to fan letters inviting readers to look for more hockey players and McFarlane's personal love and knowledge of hockey and its audience.

McFarlane and TMP do not explain why these were not reliable facts on which to base this opinion. Instead, they cite to Brooks's testimony that he had not tried to figure out how many of the millions of issues of *Spawn* were sold to hockey fans and that he would not disguise someone—the way Twist is "disguised" as a cartoon gangster in the comic book—if he was paying that person to endorse a product. These excerpts of testimony do not show how the facts and data on which Brooks *did* base his opinion were unreasonably unreliable. At worst, the testimony highlights other information on which Brooks could have relied and an alleged reason to discredit his ultimate conclusion regarding the defendants' marketing intentions—all of which was addressed on cross-examination. *See Schreibman v. Zanetti,* 909 S.W.2d 692, 698 (Mo.App. W.D.1995) (expert's failure to consider certain facts, which was explored during cross-examination and examination of opposing expert, is matter of weight, not admissibility). Thus, these matters go to the weight of Brooks's testimony, not to its admissibility.

**b. Brooks's opinion regarding causation**

McFarlane and TMP challenge Brooks's opinion that major brand products will no

*QuikTrip Corporation,* 81 S.W.3d 54, 63 n. 9 (Mo.App. W.D.2002).

longer associate with Twist because of his association with *Spawn* products, claiming that it was without foundation and not based on facts within Brooks's knowledge. This argument is also belied by the record, which shows that this opinion was based on Brooks's review of the defendants' products and on his experiences with negative celebrity connotations and marketing campaigns. Brooks testified that the defendants' products included potentially offensive material. Because of the repetitive association of Twist with those products, using him as a spokesperson would be a "tremendous liability." Based on his experience, a celebrity's negative associations are researched when a company considers whether to use a particular celebrity in a marketing campaign—the celebrity is usually unaware that he or she is being considered and may be excluded from consideration because of those negative connotations before ever being approached by the company. McFarlane and TMP complain that Brooks had not spoken with any company who had told him that they would not use Twist because of his association with *Spawn* products. But Brooks indicated that he did not think that information was necessary. This, and the other evidence to which McFarlane and TMP point demonstrating that Twist did in fact have endorsement deals after his association with *Spawn*, go to the weight of Brooks's testimony, not to its admissibility, and were addressed on cross-examination. *See id.* at 698.

### c. Brooks's opinion regarding range of Twist's losses

McFarlane's and TMP's main problem with Brooks's testimony is his opinion that Twist will lose $3 million to $50 million as a result of the defendants associating him with *Spawn* products. In Brooks's experience, that is the "range of reward that individuals that have had long-term consumer product endorsement, spokesperson capacities have earned." Brooks did not derive this range from any specific endorsement or appearance contracts; rather, it was based on his personal experiences at Anheuser–Busch with Curtis Greer, a former NFL player, and Kenny Bernstein, a race car driver. Greer had an "earning reality" of at least $3 million because of the personal appearances, the opportunity to purchase a beer distributorship and a career as a full-time employee of the company, which resulted from his spokesperson deal with Anheuser–Busch. Bernstein, because of his relationship with the company, eventually became the owner of a Budweiser racing team and had the opportunity to earn in excess of $50 million. It was very possible, Brooks believed, that Twist could have been afforded the same opportunities as Greer and Bernstein had the defendants not tarnished Twist's reputation. Brooks agreed that the range was broad, but based on Greer's and Bernstein's experiences, he believed that was the appropriate range of opportunities available for someone in a long-term relationship with a consumer products marketing company. Brooks would not speculate about which of those individuals Twist was more like or what Twist would have done with any opportunities with which he was presented.

According to McFarlane and TMP, Brooks's comparison of Twist to Greer and Bernstein was not meaningful because they had nothing in common and because his statements about Greer and Bernstein were vague "anecdotal musings," not supported by documentation or otherwise verified. They point out that Brooks never tried to place a value on Twist's services before and after his association with *Spawn*, did not identify any hockey player in Twist's position who had taken advan-

tage of the opportunities that Brooks claimed Twist was being denied and never explained how Twist would have parlayed his current $1,000 appearance fee into the millions of dollars Brooks claimed he could earn. McFarlane and TMP claim that this opinion was totally speculative and construe what Brooks did as "plucking two huge numbers from thin air without any foundation whatever."

We find that it was reasonable to use the experiences of other celebrities—both of whose endorsement careers, Brooks testified, had started out similarly to Twist's with local appearances—to form an opinion about Twist's potential endorsement opportunities. That his testimony about Greer's and Bernstein's experiences was anecdotal and not verified by documentation may affect the weight to be given Brooks's opinion, but it does not destroy the reliability of that information as a source for comparison. Likewise, to the extent there were things about Greer's and Bernstein's experiences that differed from Twist's potential experiences or other evidence—like Twist's actual endorsement deals or the deals of other hockey players—that tended to discredit Brooks's testimony, those are matters of weight that were fully explored on cross-examination. As are the claims that Brooks's ultimate conclusion was overly broad and speculative.

McFarlane and TMP also argue that Brooks's opinion lacked the "reasonable certainty" required for proof of damages in the nature of lost profits and, to the extent the damages were based on a loss of earning capacity, the opinion is speculative without evidence that Twist had worked in the field in which he claims lost earnings. As the Supreme Court clar-

ified in the first appeal, "in a right of publicity action, 'the measure of damages properly focuses on the pecuniary loss to the plaintiff or the unjust pecuniary gain to the defendant.'" *Doe,* 110 S.W.3d at 368 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 49 cmt. b). While the plaintiff has the burden of proving his pecuniary loss, "the amount of loss must be shown only with such certainty as is reasonable under the circumstances." RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 49 cmt c. Brooks's opinion was directed at this pecuniary loss element of damages, and the challenges McFarlane and TMP raise regarding certainty and speculation go to the weight of Brooks's ultimate conclusion, not to the admissibility of this opinion.

### d. Conclusion

In sum, all of Brooks's opinions were based on facts and data of the type reasonably relied upon by experts in the field and were otherwise reasonably reliable. The sources he relied on were not so slight as to render his opinions fundamentally unsupported. There was substantial information to support his opinions, they were not based on mere conjecture or speculation, and there was a rational basis for Brooks's conclusions. Therefore, it was not an abuse of discretion to admit his testimony. Point denied.

### 2. Till's Testimony Regarding Royalties from *Spawn* Products

Till also testified on Twist's behalf regarding damages. He is a professor in the marketing and advertising department at St. Louis University. His qualifications as an expert by way of his knowledge, skill, experience, training or education are not questioned on appeal.[9] Prior to forming

---

**9.** Till has an MBA in marketing and accounting and a Ph.D. in marketing and psychology. His dissertation topic for his Ph.D. was celeb-

rity endorsers in advertising and negative celebrity information. Till has also published other articles regarding celebrity endorse-

his opinions for this case, Till reviewed a number of *Spawn* comic books, season one of the HBO animated *Spawn* series, the defendants' internal documents, information regarding Twist's recognition and publicity, magazine articles, professional endorsement contracts, several of the defendants' licensing agreements and deposition testimony. Till testified that "these are the kind of materials that people in my profession rely on in forming opinions and find reliable to forming these opinions." He also relied on his training, education and background in forming his opinions. Although he could have and has in other cases where it was necessary, Till did no independent research and did not conduct any studies.

Till opined that the use of Twist's name and persona has a special monetary value to all *Spawn* products because Twist had spent a lot of time developing his hockey career and worked hard to build goodwill around his name with children and hockey fans. Since these were two groups targeted by the defendants, Till believed that the *Spawn* franchise values its association with Twist's name and persona. Till also gave opinions about the compensation due to Twist because of the use of his name: 15% of revenues generated by all *Spawn* products in which his name or persona are used and 9% of revenues generated from all other *Spawn* products. Till said Twist was entitled to a percentage of the revenue from sales of the first issue of the *Spawn*

comic book forward, even though the Twist character did not appear until later, because later issues promoted and stimulated sales of those earlier issues. And Till testified that Twist's entitlement to royalties should go into infinity, even if the "Tony Twist" character never appeared again. Till also stated that it was his opinion that a significant portion of the value of Twist's name and persona resulted from Twist's own efforts, that his name as used by the defendants was a symbol of Twist's identity and that the defendants intended to gain a commercial advantage by using Twist's name and persona.

McFarlane and TMP contend on appeal that Till's testimony should not have been admitted because his opinions lacked foundation, were speculative and would allow Twist to receive royalties in perpetuity for products with which his name had never been associated. We address their specific arguments regarding each of Till's opinions in turn.[10]

### a. Till's opinion regarding monetary value of Twist's name

McFarlane and TMP claim that Till's predicate opinion regarding the special monetary value of Twist's name to the defendants was not based on any independent research to determine whether anyone associated the comic book character with Twist or bought a *Spawn* product because of the presence of the name "Tony Twist." Once again, they do not explain

ments and has given presentations on the topic. He has consulted with companies regarding celebrity endorsements for *Monostat* and *I Can't Believe It's Not Butter* brand products. Till is currently the chair of the marketing department at St. Louis University and teaches marketing management and advertising classes.

10. Although they purport to challenge the admissibility of all of Till's opinions on appeal, McFarlane and TMP do not provide any sup-

porting argument regarding the opinion that the value of Twist's name resulted from his own efforts. As to Till's opinions regarding the defendants' use of Twist's name as a symbol of his identity and their intent to gain a commercial advantage, McFarlane and TMP claim that intent is a subject "unsuited to expert testimony." For the same reasons discussed in section II.B.1.a of this opinion, *supra*, we disagree. We find no abuse of discretion in admitting any of these three opinions.

how the material on which Till did base this opinion lacked reliability. In reaching his conclusion, Till found the national and local media attention Twist had received, Twist's charity work with children and the defendants' internal documents showing their marketing efforts to hockey fans and children to be significant. That Till did not conduct any additional independent research—something he stated he does only when necessary—is a matter of weight, not admissibility, and was brought to the jury's attention on cross-examination. *See Schreibman*, 909 S.W.2d at 698.

### b. Till' s opinion regarding 15% and 9% royalties

Till's opinion that Twist was entitled to receive 15% of revenues generated by all *Spawn* products in which his name or persona are used was based on the fact that the associations drawn between *Spawn* and Twist have limited Twist's appeal as an endorser for other products. To confirm the 15% figure, Till reviewed a licensing agreement in which four hockey players of the NHL players association were to be featured in a comic book in exchange for 9% of the revenue from sales of the comic book. He also reviewed two TMP International, Inc. licensing agreements for action figures: one gave the NHL players association a royalty rate of 9% and one gave Wayne Gretzky a royalty rate of 8%. Till testified that neither the players association nor Gretzky had negative connotations associated with them the way Twist did because of *Spawn*. Thus, Till justified that 15% of the revenue from products in which his name was used was the proper royalty rate in this case to take into account Twist's negative portrayal in *Spawn* and the comic book's wide distribution and popularity.

As for his opinion that Twist should receive 9% of all other *Spawn* products not using his name, Till explained that was based on the early use of the "Tony Twist" character and the defendants' cross-marketing efforts amongst the HBO animated series, the comic books and other *Spawn* products. None of the agreements Till reviewed gave royalties for sales of products in which the athlete's name was not used. Till admitted that meant that Twist would get more from the sale of Wayne Gretzky action figures (9%) than Gretzky himself would get for sales of those toys (8%).

McFarlane and TMP argue that the licensing agreements were not reliable sources of information from which to derive Till's 15% and 9% royalty figure because those agreements contained lower royalty rates and did not give the athletes therein royalties from products not using their names. They also point out that Till did not look at any of Twist's actual endorsement deals or do any calculations to reach these figures, relying only on the materials provided by counsel. Till explained that he arrived at higher rates for Twist than were given to other athletes to account for the negative connotation his name carried because of the association with *Spawn*. McFarlane and TMP contend these "reasons of negativity" were not explained. To the contrary, they were explained—how well is a matter of weight. Till also explained that Twist should receive royalties from products not using his name because of the defendants' cross-marketing efforts. Again, the weight to be given this explanation is not relevant to the opinion's admissibility. We find nothing unreasonable about relying on the defendants' and other licensing agreements containing royalties for use of a name to reach a conclusion about what Twist should receive for the defendants' use of his name. In fact, the Restatement (Third) of Unfair Competition recognizes that expert testimony concerning the li-

censing fees paid to similarly-situated persons for comparable uses is relevant to determine the fair market value of a defendant's unauthorized use of a plaintiff's name in a right of publicity case. *See* sec 49 cmt. d. That Till also could have looked at some of Twist's actual endorsement deals is, again, a matter of weight that was explored on cross-examination. *See Schreibman,* 909 S.W.2d at 698.

McFarlane and TMP also argue that Till's methodology for arriving at this fair market value of Twist's name did not take into account a willing buyer and a willing seller and ignored that Twist was not recognizable and had no endorsements at the time *Spawn* was first published. But Till explained his belief that if Twist had been a willing seller of his endorsement services and the defendants had been willing buyers, then they would have negotiated a 15% royalty rate for using Twist's name and identity in the defendants' products. Again, the weight to be given this explanation in light of the deals that the defendants had actually entered into with other athletes is not a matter affecting the opinion's admissibility.

The remainder of McFarlane's and TMP's complaints about Till's testimony are directed at the substance of his ultimate conclusion: they contend that Till's opinion would allow Twist to receive royalties for sales of comic books issued before the "Tony Twist" character appeared, at which point sales of *Spawn* declined, and for sales into the future even though the defendants no longer used Twist's name in the storyline; would allow Twist to receive royalties earned by a company that was not even formed when *Spawn* was introduced; and would allow Twist to receive royalties from sales in foreign countries in which Twist is unknown. These problems were explored on cross-examination and, again, go to the weight to be given Till's opinion, not to the admissibility of the opinion based on a lack of reasonably reliable foundation.

### c. Conclusion

In sum, all of Till's opinions were based on facts and data of the type reasonably relied upon by experts in the field and were otherwise reasonably reliable. The sources he relied on were not so slight as to render his opinions fundamentally unsupported. There was substantial information to support his opinions, they were not based on mere conjecture or speculation, and there was a rational basis for Till's conclusions.[11] Therefore, it was not an abuse of discretion to admit his testimony. Point denied.

### C. Admission of Other Evidence

 McFarlane and TMP contend that the court erred in admitting into evidence the *Spawn Tribute* article in *Wizard* magazine and season one of the HBO animated

---

11. Till testified at the first trial, and McFarlane and TMP make much of the fact that in the alternative order for new trial that the trial court issued in that case, the court called Till's opinions "junk economics" and found that it had erred in admitting that testimony. That court's assessment of this expert's testimony at the first trial is wholly irrelevant to our review of the decision to admit this testimony at the second trial. It has also been noted that on the first appeal, the Supreme Court referred to Till's opinions as "purported expert testimony" when describing the evidence at trial. *See Doe,* 110 S.W.3d at 367. It has been suggested that use of the word "purported" was meant as a hint that the Supreme Court did not believe Till's testimony was admissible expert testimony. We read the use of the word "purported" as simply an effort not to reveal anything about the Court's position on the admissibility of Till's testimony, as that was not an issue addressed in that opinion, or as a reference to the fact that the trial court had ultimately ruled that the testimony was inadmissible.

*Spawn* series because they were not created by McFarlane or TMP; rather, the article and the series were the work product of other entities that had settled prior to the second trial. Therefore, McFarlane and TMP contend, this evidence was hearsay, irrelevant and prejudicial. We will not disturb the trial court's decision regarding the admission of evidence absent a clear abuse of discretion. *Fairbanks v. Weitzman,* 13 S.W.3d 313, 318 (Mo.App. E.D.2000). We find no such abuse here.

### 1. *Wizard* Article

In the *Wizard* magazine article, McFarlane was quoted as saying that he names his characters after friends and family. The article explained that a few of the characters are similar to their real-life counterparts and others "appropriate only the name." The article contained pictures and biographies of several characters and their "real-life persona," including "Anthony 'Tony Twist' Twistelli" and his real-life persona, Tony Twist. It featured a reproduction of Twist's hockey trading card next to a depiction of the "Tony Twist" character with the following text:

> The Mafia don that has made life exceedingly rough for Al Simmons and his loved ones, in addition to putting out an ill-advised contract on the Violator, is named for former Quebec Nordiques hockey player Tony Twist, now a renowned enforcer (i.e., "goon") for the St. Louis Blues of the National Hockey League.

The author of the *Wizard* article testified that no one other than McFarlane gave input for the content of the article and that, although there were some editorial word changes and some of the text in his draft was cut, the final article that was published accurately reflects what McFarlane told him in the interview. He testified that McFarlane told him that the "Tony Twist" character was based on the

real-life person Tony Twist, who was an NHL St. Louis Blues right-winger. The author testified that the magazine procured the hockey card that is reproduced in the article. He stated that the information in the text next to the reproduction of the card and the character's depiction came from McFarlane, except that McFarlane did not use the word "goon." The magazine editor testified that he added the word "goon," that he chose the word "appropriate" in the opening paragraph of the article to mean that the defendants used the names of real people for the characters and that he chose the phrase "real-life persona." McFarlane testified that he had his assistant get him interviews with media, knowing that *Wizard* would be included, and agreed that he had told the author of the *Wizard* article that the "Tony Twist" character was named after Twist the hockey player.

■■■■ First, the relevance of this article cannot be questioned. Evidence is relevant if it tends to prove or disprove a fact in issue or if it tends to corroborate other relevant evidence. *Jone v. Coleman Corporation,* 183 S.W.3d 600, 608 (Mo.App. E.D.2005). Despite McFarlane's and TMP's characterization of the article as a third-party's work, it contained McFarlane's statements about the way he names his characters and his specific admission that the "Tony Twist" character was named after Twist the hockey player. This was not a collateral matter. It was directly relevant to Twist's right of publicity claim—it tended to prove that the defendants used Twist's name as a symbol of his identity and that they used his name to gain a commercial advantage. In fact, the Supreme Court cited this article on the first appeal, along with McFarlane's responses to fan letters and other fans' association of Twist with *Spawn,* as evidence that the defendants used Twist's name as a

symbol of his identity. *See Doe,* 110 S.W.3d at 370. Similarly, that McFarlane mentioned Twist in his interview for this article was one of the actions taken by the defendants that tended to show their efforts to create the impression that Twist was affiliated with *Spawn,* which was relevant to the commercial advantage element of Twist's claim. *See id.* at 371.

■■■■ We also find no merit in McFarlane's and TMP's contention that the article is inadmissible hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in that statement. *Skay v. St. Louis Parking Company,* 130 S.W.3d 22, 27 (Mo.App. E.D.2004). But statements of a party-opponent are admissions and may be admitted at trial as an exception to the hearsay rule if they meet certain requirements. *Bueneman v. Zykan,* 52 S.W.3d 49, 56 (Mo.App. E.D.2001). First, the admission must be a conscious or voluntary acknowledgment by a party-opponent of the existence of certain facts. *Id.* In this article, McFarlane consciously and voluntarily acknowledged that he named his characters after real people, including specifically naming the "Tony Twist" character after Twist the hockey player. Second, the matter acknowledged must be relevant to the cause of the party offering the admission. *Id.* As discussed above, that the "Tony Twist" character was named after Twist was clearly relevant to Twist's right of publicity claim. Finally, the matter acknowledged must be unfavorable to, or inconsistent with, the position taken at trial by the party-opponent. *See Bueneman,* 52 S.W.3d at 56. McFarlane claimed at trial that he only subconsciously considered Twist when naming the character and instead insisted that he had other "literary" reasons for choosing the name "Tony Twist." *See* section II.A, *supra.* Thus, to the extent the article contained statements

attributable to McFarlane, it was admissible as the admission of a party-opponent.

The article also contained statements that McFarlane did not make—specifically, McFarlane and TMP complain about the reference to Twist as a "goon," inclusion of Twist's picture and use of the word "appropriate" to describe how the defendants used real people's names. Calling Twist a "goon" was not hearsay because that statement was not offered for the truth thereof. And it is not clear to this Court what, if any, statement is being made by the reproduction of Twist's hockey card. McFarlane's and TMP's real problem with this article is that it *implied* that the defendants used those words and published Twist's picture. But the editor and the author testified in court by way of deposition and were cross-examined, explaining that McFarlane had not used the words "goon" or "appropriate" and that the magazine had acquired Twist's hockey trading card. *See Unlimited Equipment Lines, Inc. v. Graphic Arts Centre, Inc.,* 889 S.W.2d 926, 937 (Mo.App. E.D.1994) (when declarant testifies about his statements and is subject to cross-examination, there is no prejudicial error in allowing another witness to testify about those statements, even if they are hearsay). All of the evidence regarding the interview for and the writing, editing and composition of the article was before the jury. Thus, there was nothing misleading or confusing about which parts of the article were attributable to things McFarlane said and did and which were the word choices of the editor and author or the actions of the magazine. Therefore, we cannot say there was any unfair prejudice resulting from the admission of this article.

### 2. HBO Animated Series

■■■ A videotape of the first season of the HBO animated *Spawn* series was admitted into evidence and played for the

jury at trial. The "Tony Twist" character appears in the video, which is titled "Todd McFarlane's *Spawn*." Before the credits listed on the videotape box, it says "Home Box Office presents Todd McFarlane's *Spawn*," and McFarlane is listed as the creator and executive producer. Todd McFarlane Entertainment is also identified at the end of the credits, along with HBO Animation and HBO Home Video. Before each episode that aired on HBO, McFarlane gave a personal introduction—although that was not included in the video.

McFarlane was approached by Andrew Horne, an executive at Warner Brothers, about doing an HBO series shortly after the first issue of *Spawn* came out. Horne gave HBO copies of the *Spawn* comic book, one of which included an appearance by the "Tony Twist" character, but otherwise that character was not mentioned in any of Horne's conversations about the series and he was unaware there was a hockey player named Twist.

Ultimately, HBO paid McFarlane for the right to use the *Spawn* storyline and its characters in the animated series. According to the rights option agreement, the parties had "mutual approval rights" over the creative elements of the series unless they disagreed about something, in which case HBO had final approval. According to both McFarlane and the HBO executive involved in producing the series, HBO had final authority as to the contents of the series, scheduling, which characters would be included in the show and the existence of a warning label. HBO hired and paid the writers, the directors, the producers, the artists, the animators and the crew.

Throughout McFarlane's testimony, however, it became clear that regardless of HBO's final authority, McFarlane had a significant role in the creation of the animated series. Although he was not the actual scriptwriter, he testified that he created the storylines and the characters that were in season one, along with other writers; the scripts were written at his direction and with his approval, although he did not have final approval; he "oversaw" the scripts and made suggestions; he "gave guidance to everybody" regarding the storyline and the characters; he did "some noodling" with the scripts; he was aware of what lines and actions were given to the "Tony Twist" character throughout season one; he "signed off" on the scripts; he "oversaw the whole production." McFarlane claimed that despite HBO's authority and ability to make changes, "overall I had a big hand in it."

There was also evidence that the videotape was one of the *Spawn* products that the defendants used to cross-promote other products. It featured an insert with information about receiving a free *Spawn* poster, and there were advertisements in the comic books for the animated series. McFarlane testified that he still receives payments from the airing and renting of season one of the HBO series.

■■■ First, McFarlane's and TMP's contention that the videotape was "unadulterated hearsay" because it was a "third-party production offered to prove the proposition that plaintiff was injured by the use of his name in that animation" is wholly without merit. The videotape was not offered to prove the *truth* of anything depicted therein; it was offered to show that the "Tony Twist" character appeared in the series and its relevance lies in the fact that the series was made. "[E]vidence is hearsay only if its evidentiary value depends on drawing an inference from the truth of the statement. Furthermore, if the relevance of the statement lies in the mere fact that it was made, no reliance is placed on the truth of the statement or the credibility of the out-of-court

declarant, and the statement is not hearsay." *Rodriguez v. Suzuki Motor Corporation*, 996 S.W.2d 47, 59 (Mo. banc 1999). Because it contained Twist's name, the videotape was relevant to Twist's claim that his name was used without his permission in violation of his publicity rights. Moreover, it tended to show the extent of the violation for purposes of assessing damages. McFarlane and TMP counter that the video had no relevance because it was HBO's production, not a creation of the defendants. Of course, McFarlane himself claimed he had quite a large role in the creation of the series, admitted that he was aware of the use of the "Tony Twist" character therein and acknowledged that he promoted the series and gained a monetary benefit from it. As with the *Wizard* article, all of the evidence about how much authority and involvement McFarlane had vis-à-vis HBO was before the jury, and therefore, there was nothing misleading about whose work the videotape represented. Thus, there was no prejudicial error in admitting the videotape.

In sum, we find no clear abuse of discretion in the admission of either the *Wizard* article or the videotape of the HBO animated *Spawn* series. Point denied.

## D. Damages Instruction

▆ The jury was instructed on damages as follows:

If you find in favor of the plaintiff, then you must award plaintiff:

1. Such sum as you may find from the evidence to be the fair market value of what the defendant should have paid to use the plaintiff's name in connection with its products, and/or

2. Such sum as you may find from the evidence to be the amount of damage done and is reasonably certain to be done in the future to the commercial value of plaintiff's name.

In measuring plaintiff's damages, you may consider the pecuniary loss to plaintiff and/or the unjust pecuniary gain to the defendant.

▆ At the instruction conference, the defendants asserted that inclusion of the language "and is reasonably certain to be done in the future to the commercial value of the plaintiff's name" was unnecessary, was not in *Doe* and erroneously followed MAI 4.01 instead of MAI 4.02. They contended that while future damages could be argued, those damages should not be included in the jury instruction. On appeal, McFarlane and TMP argue that inclusion of future damages was a prejudicial departure from MAI 4.02.[12]

▆ Use of the Missouri Approved Instructions is mandatory in any case where the instructions are applicable. Rule 70.02(b). But Rule 70.02 acknowl-

---

12. They also argue that the instruction was erroneous because it did not include a diminution in value standard and authorized double damages in that it allowed the jury to consider the plaintiff's pecuniary loss *"and/or"* the defendants' unjust pecuniary gain. To preserve an instructional error for review on appeal, counsel must make specific objections to the giving or failure to give instructions before the jury retires to consider its verdict; the objections and grounds therefore must be stated distinctly on the record, and the objections must also be raised in the motion for new trial. Rule 70.03. The only error al-

leged before the jury retired to consider its verdict was the inclusion of future damages. That claim was also raised in the defendants' post-trial motion and has been preserved for review. The argument regarding diminution in value was raised for the first time in the post-trial motion; the argument regarding double damages was raised for the first time on appeal, and the allegedly offensive "and/or" language was included in the defendants' own proposed instruction in the trial court. These alleged errors have not been preserved and will not be reviewed.

edges that the MAI do not cover every individual case and, accordingly, allows for modification of the approved instructions or use of non-approved instructions. *See* Rule 70.02(b). Where an MAI must be modified or a non-MAI must be used to fairly submit the issues in a particular case, the modifications or the instruction "shall be simple, brief, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." *Id.; see also Lindquist v. Scott Radiological Group, Inc.*, 168 S.W.3d 635, 652 (Mo.App. E.D.2005). The test for a non-MAI instruction is whether it follows the applicable substantive law and can be readily understood by the jury. *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 71 (Mo. App. E.D.1999).

■ Although damages were not at issue in the first appeal of this case, the Supreme Court did clarify that "in a right of publicity action, 'the measure of damages properly focuses on the pecuniary loss to the plaintiff or the unjust pecuniary gain to the defendant.'" *Doe,* 110 S.W.3d at 368 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION sec. 49 cmt. b). The available damages distinguishes this tort from a misappropriation of name case in which the plaintiff may also recover for mental or emotional distress and suffering. *Doe,* 110 S.W.3d at 368. The "misappropriation of name tort protects against intrusion upon an individual's private self-esteem and dignity, while the right of publicity protects against commercial loss caused by appropriation of an individual's identity for commercial exploitation." *Id.* (internal brackets and quotation marks omitted). McFarlane and TMP contend that because personal damages are not available in this case, MAI 4.02—for cases involving property damages only—must be followed, and that including future damages improperly allowed for the recovery of future personal injuries to Twist's reputation. We disagree.

None of the MAI fit the circumstances of this case or the measure of damages applicable to this right of publicity case as set forth in *Doe.* The measure of damages for cases involving property damages in MAI 4.02 is the difference between the fair market value of the property before and after it was damaged or, in some situations, the cost of repair. *See* MAI 4.02, Notes on Use 2.[13] These are not the proper measures of damages in a right of publicity case. *See Doe,* 110 S.W.3d at 368. Nor is MAI 4.01—for cases involving personal and property damages—appropriate for this case, at least not without modification, because it does not include the measure of damages set forth in *Doe.*[14] Thus, it was appropriate to use modified versions of the approved instructions and non-approved language.

**13.** MAI 4.02 provides:
 If you find in favor of plaintiff, then you must award plaintiff such sum as you may find from the evidence to be the difference between the fair market value (*here identify property*) before it was damaged and its fair market value after it was damaged, [plus such sum as you may find from the evidence will fairly and justly compensate plaintiff for the loss of use thereof during the time reasonably necessary for the property to be repaired or replaced.]

**14.** MAI 4.01 provides:

 If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained [and is reasonably certain to sustain in the future] as a direct result of the occurrence mentioned in the evidence. [If you find that plaintiff failed to mitigate damages as submitted in Instruction Number ——, in determining plaintiff's total damages you must not include those damages that would not have occurred without such failure.]

Furthermore, it was proper to include the phrase "and is reasonably certain to be done in the future." Inclusion of that phrase—regardless of its use in MAI 4.01—did not convert this into a personal injury case because nothing in that phrase or elsewhere in the instruction intimates that Twist sustained or could recover for personal injuries. The instruction as given clearly limits damages to the damage done to the commercial value of Twist's name— a pecuniary loss, not a personal injury— which is precisely what the Supreme Court allows in this type of case. *See Doe,* 110 S.W.3d at 368. Moreover, nothing in *Doe* would preclude a plaintiff in a right of publicity case from recovering for future damage to the commercial value of his name. In fact, the Restatement (Third) of Unfair Competition—quoted in *Doe* as the source of the measure of damages—expressly acknowledges that a celebrity may recover for the reduction in his future economic opportunities caused by a defendant's unauthorized use:

> Celebrities who actively exploit their name or likeness may also recover for any reduction in the commercial value of their identity caused by the defendant's unauthorized use. Such a reduction in value may result, for example, from the manner or form of the unauthorized use, the quality or nature of the goods or services with which the plaintiff's identity is used, overexposure of the identity, or from other characteristics of the use that reduce the plaintiff's future economic opportunities.

Sec. 49 cmt. d. (emphasis added).

In short, this instruction followed the applicable substantive law as set forth in *Doe* and could not have been misunderstood by the jury as authorizing damages for personal injuries. We find no error. Point denied.

## III. CONCLUSION

The judgment is affirmed.

BOOKER T. SHAW, J., and NANNETTE A. BAKER, J., concurring.