**CHINA WORLDBEST GROUP CO., LTD., Plaintiff–Appellant/Respondent,**

v.

**EMPIRE BANK, Defendant–Respondent/Cross–Appellant.**

**Nos. SD 30453, SD 30487.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 21, 2012.

Motion for Rehearing and Transfer Denied June 12, 2012.

Application for Transfer Denied Aug. 14, 2012.

Richard L. Rollings, Jr. of Camdenton, MO, for Appellant/Respondent.

Richard L. Schnake of Springfield, MO Division II, for Respondent/Cross–Appellant.

JEFFREY W. BATES, Judge.

China Worldbest Group Co., Ltd. (Worldbest) appeals from the trial court's entry of judgment on a jury verdict, which awarded Worldbest no damages in its action against Empire Bank (Empire) for alleged negligence in the handling of a documentary collection. Worldbest contends: (1) the jury verdict upon which the trial court entered its judgment was inconsistent, in that the verdict found Empire negligent but awarded no damages to Worldbest; and (2) the trial court erred in admitting evidence about the poor quality of the goods delivered pursuant to the contract underlying the documentary collection. Empire has cross-appealed. It contends the trial court erred in denying Empire's motion for judgment notwithstanding the verdict (JNOV) because: (1) Empire owed no legal duty to Worldbest; and (2) Worldbest did not have standing to sue because it had assigned its rights to a third party. We affirm.

## I. Factual and Procedural Background

Tricia Derges (Derges) started Mostly Memories, Inc. (Mostly Memories) in 1993. Mostly Memories created bath, body and candle products for retail sale. Mostly Memories imported some products it sold from China.

In 1999 or 2000, Mostly Memories began importing products made in factories owned by Michael Chao (Chao). Chao operated a company called Rucon International (Rucon). Chao and Rucon were agents of Worldbest, which engaged in the import and export business. Derges submitted orders and discussed the quality of shipments with Chao by email. Derges would wire the purchase price to Chao after the shipping containers arrived. She never paid for product without inspecting it first. When nonconforming product arrived, Derges would email Chao. Chao would either replace the product or instruct Derges not to pay for it.

In 2004, Mostly Memories was given the opportunity to present a special show on the QVC television shopping network. Derges ordered 55,000 spice racks from Chao to present for sale on that show. The spice racks were wooden cabinets with ceramic drawers. Each drawer contained a scented candle. Derges arranged to have Chao manufacture the spice racks and ship them directly to QVC. As part of that process, Chao shipped a sample spice rack to Derges. She was concerned because the scent on the candles was weak. Chao told Derges not to worry because the remainder "would be just fine." Derges paid a $100,000 down payment on the spice racks.

After the first installment of spice racks were manufactured and shipped, Worldbest sent a documentary collection to Empire. The documentary collection was a group of documents which included a col-lection instruction, a bill of lading for the shipped spice racks and a sight draft for the purchase price of the spice racks. The collection instruction told Empire to "deliver documents against payment." When Empire received the packet, the documents were forwarded to Mostly Memories. No payment was made.

When the first shipment of spice racks arrived at QVC, the product failed a quality test known as the drop test. Because QVC sold its products primarily through the mail, it required packaging that would protect the product from possible rough handling during shipping. To make that assessment, a sample in its original packaging would be dropped and then opened and inspected for breakage. The spice racks failed the drop test on three occasions.

Derges arranged to have the remaining shipments sent to the Mostly Memories factory so her employees could repack the spice racks. When the spice racks arrived, Derges discovered that there were additional quality problems. The ceramic drawers were different sizes, and many were stuck in the wooden cabinets. Some of the ceramic drawers had been broken, revealing that the candles were made of inferior wax "with about a quarter inch of really pretty covering so that it would hide the junk wax below."

Derges informed Chao of the problems with the spice racks. Chao admitted that he knew some of the spice racks in the first shipment did not meet the quality specifications. Chao assured Derges that 90 percent of the spice racks conformed to the specifications. Meanwhile, employees of Mostly Memories continued unpacking the spice racks to repack them for shipment to QVC; Derges discovered that "way over ten percent" of the spice racks were damaged or of inferior quality.

Derges told Chao she wanted to cancel the contract. Chao apologized and urged her to accept the additional shipments. Chao told Derges not to pay for the spice racks, but to repair them and pay after the repairs had been completed. Chao said he would take full responsibility.

Derges continued the efforts to salvage the spice racks. Worldbest continued to send documentary collections in connection with the shipments, and Empire continued to forward the bills of lading to Derges without requiring payment on the drafts for the purchase price. Ultimately, the salvage of the project was not successful, resulting in losses well over the purchase price.

In December 2004, Worldbest filed a petition against Empire. Relying on Article 4 of the Uniform Commercial Code (UCC), the petition alleged that Empire accepted Worldbest's documents for collection and was negligent in its subsequent handling of the documentary collection. The petition further alleged that Empire was liable for the face value of the drafts based on its action of failing to collect the drafts before delivering the bills of lading to Mostly Memories. Worldbest sought $442,900 in damages, plus interest.

In Empire's answer, it denied that it agreed to act as a collecting bank. Empire also alleged that Worldbest waived the requirements of the collection instructions through its course of dealing with Mostly Memories by allowing Mostly Memories to inspect goods before accepting them. Finally, Empire alleged that Worldbest suffered no damages as a consequence of any alleged breach because it delivered nonconforming goods.

A three-day jury trial was conducted in December 2009. The trial court admitted the six documentary collection packets that involved the spice rack transactions. Worldbest also presented the testimony of

banking expert Walter Baker, III (Baker). Baker explained the process of documentary collections like those used in the transaction between Worldbest and Mostly Memories. He testified that in a "document against payment transaction[,]" the bank releases the shipping documents when it receives payment.

Derges testified on Empire's behalf. Worldbest was permitted to make a continuing objection that Derges' testimony about "any problems with the product are not relevant to any liability that Empire Bank has for failing to comply with the collection instructions in this case[.]" The court overruled the objection and received Derges' testimony on this subject, which we summarized above.

The jury unanimously found in favor of Worldbest, but awarded no damages. After the verdict was read, the jury was removed from the courtroom. Worldbest's counsel objected that the verdict was inconsistent because the finding was for the plaintiff, but no damages were assessed. Other than making that observation, Worldbest's counsel did not request any relief. Empire's counsel argued that the evidence supported a finding by the jurors that Worldbest did not actually sustain any damages. The court decided to accept and file the verdict. Worldbest's counsel declined the opportunity to make any further record on this issue. Thereafter, the trial court entered judgment on the jury's verdict. After the denial of Worldbest's motion for new trial and Empire's motion for JNOV, both parties appealed.

## II. Discussion and Decision

### Worldbest's Appeal

In Worldbest's first point, it contends the trial court erred in accepting the jury's verdict. Worldbest argues that the verdict was inconsistent because the jurors

found that Empire was negligent, but awarded no damages. Empire responds that any inconsistency in the verdict was waived because Worldbest did not request appropriate relief at trial. We agree with Empire.

 To preserve for appellate review a claim that the jury's verdict was inconsistent, the party must object before the jury is discharged. *Harrell v. Mercy Health Services Corp.*, 229 S.W.3d 614, 617 (Mo.App.2007). When a party believes the verdict is inconsistent, the "proper method of seeking relief [is] to request the trial court to return the jury for further deliberation." *Id.* at 618. If the objecting party does not request that the jury be returned for further deliberation, the claim of error is waived. *O'Brien v. Mobil Oil Corp.*, 749 S.W.2d 457, 458 (Mo.App.1988). This is true even if the party objects to the inconsistent verdict and requests some other type of relief. *Id.* (holding that a claim that the verdict was inconsistent was waived where the plaintiff objected but merely requested that the jury be polled instead of requesting that the jury be returned for further deliberation); *Harrell,* 229 S.W.3d at 618 (holding that a claim that the verdict was inconsistent was waived where the plaintiff objected and requested a mistrial, but did not request that the jury be returned for further deliberation).

Here, Worldbest did not request that the jury be sent back to deliberate further. Because that relief was not requested, Worldbest waived any claim of error with respect to the alleged inconsistency in the verdict. *See Harrell,* 229 S.W.3d at 618; *O'Brien,* 749 S.W.2d at 458. Point I is denied.

 In Worldbest's second point, it contends the trial court erred in allowing Empire to present evidence regarding the quality of the spice racks because that evidence was not relevant. We disagree.

We review decisions regarding the admissibility of evidence for an abuse of discretion. *Gurley v. Montgomery First Nat. Bank, N.A.,* 160 S.W.3d 863, 870 (Mo.App. 2005). An abuse of discretion occurs when the trial court's decision "is clearly against the logic of the circumstances and is so unreasonable and arbitrary that the ruling shocks the sense of justice and suggests a lack of careful consideration and deliberation." *Id.*

"To be admissible, evidence must be relevant, both logically and legally." *Id.* "Evidence is logically relevant if it tends to prove or disprove a fact in issue or corroborate other evidence." *Id.* at 870–71. The determination of whether evidence is legally relevant "involves a process through which the probative value of the evidence (its usefulness) is weighed against the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or needless presentation of cumulative evidence (the cost of evidence)." *Eagle Star Group, Inc. v. Marcus,* 334 S.W.3d 548, 557 (Mo.App.2010). Evidence that tends to prove or disprove an element of the cause of action is "directly relevant[.]" *See Doe v. McFarlane,* 207 S.W.3d 52, 71–72 (Mo.App.2006) (holding that testimony tending to prove that the symbol of identity was used to gain commercial advantage was unquestionably relevant in a right of publicity case); *Jenkins v. Revolution Helicopter Corp., Inc.,* 925 S.W.2d 939, 944 (Mo.App.1996) (noting that evidence of the plaintiff's reputation was relevant in a slander trial because damage to the plaintiff's reputation was an essential element of the cause of action).

Worldbest sought relief under Article 4 of Missouri's version of the UCC for Empire's failure to exercise ordinary care in handling the documentary collections. Ar-

ticle 4 of the UCC governs bank deposits and collections. *See* § 400.4–101.[1] Under that Article, any bank which handles an item for collection is a collecting bank. § 400.4–105(5). The definition of a collecting bank is broad, and a bank may be found to be a collecting bank merely by receipt of items for collection. *See, e.g., Morgan Stanley & Co., Inc. v. JP Morgan Chase Bank, N.A.,* 645 F.Supp.2d 248, 254–55 (S.D.N.Y.2009) (holding that the defendant bank became a collecting bank when the check was left in the bank's after-hours lockbox). Empire became a collecting bank by receiving Worldbest's documents. Consequently, the elements of Worldbest's Article 4 cause of action are: (1) Empire failed to exercise ordinary care in handling the documentary collections; and (2) damages proximately caused by that failure to exercise ordinary care. *See* § 400.4–103(e); § 400.4–202; *Marcoux v. Mid–States Livestock, Inc.,* 429 F.Supp. 155, 161 (N.D.Iowa 1977).

The damages for a bank's "failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care." § 400.4–103(e). The limitation on damages based on the amount that would be uncollectible "follows the case law." § 400.4–103 cmt. 6. Comment 6 to § 400.4–103 demonstrates that the drafters of the UCC intended to adopt the prevailing method of calculating damages. Thus, an examination of pre-UCC cases is relevant. Those cases demonstrate that an amount may be "an amount that could not have been realized by the exercise of ordinary care" under this section where the goods in the underlying transaction were of poor quality. *Northwestern Nat. Bank of Minneapolis, Minn. v. People's State Bank of Courtland, Kan.,* 109 Kan. 506, 200 P. 278, 278–79 (1921); *People's Nat. Bank v. Brogden & Bryan,* 84 S.W. 601, 601–02 (Tex.App. 1905).

For example, *Northwestern* involved a documentary collection associated with a shipment of potatoes. *Northwestern,* 200 P. at 278. The cover letter instructed the bank to deliver the bill of lading only after the draft for the purchase price had been paid, but the bank delivered the bills of lading without collecting anything on the drafts. *Id.* The potatoes were of poor quality and were ultimately sold for less than the face value of the drafts. *Id.* The buyer paid the seller the ultimate sale price, and the seller then sued the bank for the difference between the ultimate sale price and the contract purchase price. The seller alleged that the bank failed to exercise due care when it failed to follow the instructions in the cover letter. *Id.* The appellate court determined that the seller could only recover his actual loss and that, while the face value of the draft might be evidence of that loss, the bank was permitted to "show the actual damage which has been sustained by the interested party, or may show that no damage has been actually suffered by him . . . ." *Id.* at 279. That is,

> [w]hile the amount of the bill or note placed in the hands of the bank is prima facie the measure of its liability, defendant may mitigate the damages by showing *either* the solvency of the maker or acceptor, the insolvency of the indorser, that the paper was partially or wholly secured, *or* that any other fact existed which would lessen the actual loss to plaintiff, and if it appears that the depositor has not been injured, nothing can be recovered beyond nominal damages.

---

1. All references to statutes are to RSMo (2000).

*Id.* (emphasis added). Based on this reasoning, the appellate court affirmed the trial court's judgment in favor of the defendant bank. *Id.* at 280.

*Northwestern* demonstrates that the quality of the goods in the transaction underlying a documentary collection is relevant to determining the amount of damages sustained as a result of any alleged negligence on the part of the collecting bank. In the present case, the testimony about the condition of the spice racks related to the quality of the goods supplied pursuant to the transaction underlying the documentary collection. Consequently, that evidence was directly relevant to the issue of the actual damages suffered by Worldbest.

Relying on *Bar–Ram Irrigation Products v. Phenix–Girard Bank*, 779 F.2d 1501 (11th Cir.1986), and *United Postal Sav. Ass'n v. Royal Bank Mid–County*, 784 S.W.2d 906 (Mo.App.1990), Worldbest argues that an amount is uncollectible under § 400.4–103(e) only where the drawee is insolvent. Neither of those cases actually so holds. The appellate court decisions in those cases did not depend upon the reason the amounts were uncollectible, but instead upon the fact that the amounts the plaintiffs sought to recover were consequential damages. *Bar–Ram*, 779 F.2d at 1505; *United Postal*, 784 S.W.2d at 908–09. Thus, to the extent either case suggests that an amount is uncollectible only when it results from the drawee's insolvency, that language is simply dicta which we decline to follow.

Worldbest next cites *Gathercrest Ltd. v. First American Bank and Trust*, 649 F.Supp. 106 (M.D.Fla.1985), in support of the proposition "that disputes as to the fitness or quality of the goods does [sic] not affect the damages recoverable under § 400.4–103(e)." A closer analysis of *Gathercrest* demonstrates that it does not

stand for that proposition. *Gathercrest* involved two documentary collections, each of which the court addressed separately. *Id.* at 117–20. The portion that Worldbest quotes in support of its argument involved the second documentary collection. *Id.* at 119. As to the second documentary collection, the defendant bank was a payor bank, not a collecting bank. *Id.* at 118. The responsibilities of payor banks are governed by § 400.4–302, rather than § 400.4–103(e) and § 400.4–202. *See id.* In contrast, as to the first documentary collection, the defendant bank in *Gathercrest* was a collecting bank. *Id.* at 117–18. In determining the amount of damages caused by the bank's negligence with respect to the first documentary collection, the court noted that if the goods had still been available, they might have been attached. *Id.* at 118. Since the goods were no longer available because of the bank's negligence, the bank's liability was the face amount of the draft. *Id.* This analysis shows that the principle for which *Gathercrest* actually stands is that evidence with respect to the goods underlying a documentary collection is relevant to determining the amount of damages caused by the alleged negligence of a collecting bank, though not to the liability of a payor bank.

Finally, Worldbest suggests that the loss occasioned by the quality of the goods was in the form of consequential damages as opposed to direct damages. Worldbest argues that the situation is similar to a situation where the seller was not paid for the goods, the value of the goods increased, and thus the bank's alleged negligence deprived the seller of the opportunity to obtain a better price for the goods. This argument ignores the fact that the underlying dispute here was not about the inability of the buyer to pay or about the buyer's wrongful rejection of the goods, but about the nonconformity of the goods.

**16**

Damages based on the nonconformity of the goods are direct damages. *See* § 400.2–714. Worldbest breached the underlying contract by providing nonconforming goods. If Worldbest had provided conforming goods, Mostly Memories would have paid upon receipt as it had in the past, regardless of any negligence on the part of Empire.

The evidence regarding the quality of the spice racks was relevant to show that any loss sustained was not proximately caused by Empire's negligence. *Marcoux v. Mid–States Livestock, Inc.*, 429 F.Supp. 155, 161 (N.D.Iowa 1977). Therefore, the trial court did not abuse its discretion in admitting that evidence. Point II is denied.

*Empire's Cross–Appeal*

■ In Empire's cross-appeal, it contends the trial court erred in denying its motion for JNOV because: (1) Empire owed no duty of care to Worldbest; and (2) Worldbest lacked standing to sue because it had assigned its rights to Rucon. For the reasons that follow, Empire's contentions are moot and need not be addressed.

"An appeal is moot when a decision on the merits would have no practical effect on any existing controversy." *In re Smith*, 351 S.W.3d 25, 26 (Mo.App.2011). When a party to a civil action has waived its challenge to an inconsistent verdict, the "[g]eneral rules governing the interpretation of verdicts apply[.]" *Campbell v. Kelley*, 719 S.W.2d 769, 771 (Mo. banc 1986). "The court should look at the entire record to discern the intent of the jury. Liberal regard should be given to the verdict so that the court may give it effect whenever possible." *Id.* In negligence cases where unliquidated damages are an element of the cause of action, a verdict finding for the plaintiff but awarding no damages is treated as a verdict for the defendant. *Id.*

Here, the jury rendered its verdict for Worldbest, but assessed no damages against Empire. Thus, the verdict will be treated as a general verdict in favor of Empire. *See id.*; *Hadley v. Burton*, 265 S.W.3d 361, 370 (Mo.App.2008); *Heitner v. Gill*, 973 S.W.2d 98, 101–02 (Mo.App.1998); *Wilferth v. Pruett*, 854 S.W.2d 625, 626 (Mo.App.1993). Because judgment was effectively entered in favor of Empire by operation of law, the contentions asserted in its points are moot and will not be addressed.

The trial court's judgment is affirmed.

DANIEL E. SCOTT, J., and WILLIAM W. FRANCIS, P.J., concurs.

### OPINION ON MOTION FOR REHEARING OR TRANSFER

PER CURIAM.

After the issuance of this Court's opinion, Worldbest filed a timely Motion for Rehearing and an alternative Application for Transfer. *See* Rule 84.17; Rule 83.02. In the Motion for Rehearing, Worldbest contends, *inter alia*, that this Court overlooked or misinterpreted Missouri law regarding the proper measure of damages pursuant to § 400.4–103(e). According to Worldbest, this statute does not allow a bank to reduce its liability by presenting evidence regarding the quality of the goods involved in the underlying transaction. On the facts presented, we do not agree.

Derges wanted to cancel the contract. If she had, all parties could have exercised their respective UCC remedies. *See* § 400.2–106(4); § 400.2–711. Instead, almost certainly out of self-interest, Worldbest's agent Chao convinced Derges to keep accepting shipments. Chao did so by telling Derges *not to pay on delivery*, but only after she repaired (and presumably sold) the goods. Chao also agreed to take

full responsibility. One cannot fault Worldbest (through its agent, Chao) for trying to make the best of a bad situation. That's business. But if Worldbest's agent initiated a course of dealing inconsistent with Worldbest's Article 4 rights, by agreeing to take full responsibility and hoping for the best, Worldbest cannot fall back on Article 4 to hang the loss on Empire after things fall apart.

The additional arguments made in Worldbest's motion for rehearing were considered and disposed of in our original opinion. Worldbest's Motion for Rehearing is denied.

In the alternative, Worldbest asks that we transfer this case to the Supreme Court of Missouri because the issues are of general interest and importance. We decline that invitation. Our Supreme Court always carefully considers a Rule 83.04 application and will order transfer if it sees fit. *See Tucker v. Missouri Highways and Transp. Comm'n,* 250 S.W.3d 373, 375 (Mo.App.2008). Worldbest's Rule 83.02 Application for Transfer is denied.